[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
05/27/99
THOMAS K. KAHN
CLERK

No. 97-9229

D.C. Docket No. 4:96-CV-5-DF

D. LISA CLOVER,

Plaintiff-Appellee,

versus

TOTAL SYSTEM SERVICES, INC.,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Georgia

**(May 27, 1999)**

ON PETITION FOR REHEARING

Before CARNES and HULL, Circuit Judges, and HENDERSON, Senior Circuit Judge.*

_____

 *This decision is rendered by a quorum, due to Judge Henderson's death on May 11, 1999. 28 U.S.C. § 46(d).

CARNES, Circuit Judge:

Our previous opinion in this case, which is published at 157 F.3d 824 (11th Cir.1998), has already been vacated. See Clover v. Total Sys. Servs., Inc., (11th Cir. 1999). In its place, on petition for rehearing, we file this revised opinion.

Plaintiff D. Lisa Clover, a former employee of defendant Total System Services, Inc. ("TSYS"), brought this lawsuit, claiming that TSYS discharged her in retaliation for her participation in a TSYS investigation conducted in response to TSYS' receipt of an EEOC notice of charge of discrimination. After a jury awarded Clover $25,000 in compensatory damages and $160,000 in punitive damages, TSYS moved for judgment as a matter of law, contending that the evidence Clover adduced at trial was insufficient to support a claim of retaliatory discharge. The district court denied that motion, and TSYS appeals the denial. We reverse.

## I. BACKGROUND

Lisa Clover began working for TSYS, a credit and debit card data processor, in 1988. At the time of her termination on March 24, 1995, she was working as a microfiche clerk in the Support Services Division. Her immediate supervisor was Annette Jones. Jones' supervisor was Allen Pettis. The entire Support Services Division was managed by Senior Vice President Walter Miller.

On March 22, 1995, Audrey Hollingsworth, Assistant Vice President of TSYS' Human Resource Management Division ("Human Resources"), asked Jones to have Clover report to the Human Resources office on March 23, 1995 for a meeting. Apparently, there was some confusion about the meeting time. While Clover believed that the meeting was set for 9:15 a.m., Hollingsworth thought that it was scheduled for 9:00 a.m.

1

Worried that the purpose of the meeting might be to inform her of downsizing in her department, Clover spent the evening of March 22, 1995 preparing a resume. The next morning, Clover reported to the Human Resources office a few minutes after 9:15. She concedes that she arrived late. Clover told Hollingsworth that her lateness was the result of running a school errand for her nephew.

At the Human Resources meeting, Hollingsworth and Marcus Calhoun, TSYS' legal counsel, informed Clover that they were conducting an internal TSYS investigation concerning allegations of sexual harassment made by Courtney Waters, a former Clover co-worker, against Pettis. Although the record does not indicate that Clover knew it at the time, TSYS had commenced this investigation in response to receiving the notice of Waters' charge of discrimination from the EEOC.[1] For thirty to forty minutes, Hollingsworth and Calhoun asked Clover questions concerning her knowledge of the office interaction between Waters and Pettis. Once the meeting ended, Hollingsworth told Clover she was free to return to her own office, which was located across town.

Because Clover had left her wallet at home, she did not return directly to her office. She arrived at her office around 10:45 a.m., at which time Jones informed her the Human Resources meeting was confidential and she should not tell anyone about it. Jones also told her that she needed to speak with her about her most recent tardiness. Although Clover was generally a good worker, she was often tardy and had been threatened with probation in the past because of her lateness. Jones was aware that Clover had arrived late at the Human Resources office and also knew that Clover had not promptly returned to work after the meeting.

---

[1]Prior to Waters' filing of an EEOC charge of discrimination and TSYS' receipt of notice of that charge, TSYS had conducted another in-house investigation of Waters' allegations of sexual harassment. Clover did not participate in that investigation.

Jones arranged a meeting with Pettis and Clover to discuss Clover's tardiness. At Clover's request, Miller joined the meeting. At that meeting, Clover admitted she had been late to the Human Resources meeting. At trial there was some dispute about the explanation Clover gave for being late. According to Miller, Clover claimed during their meeting that she was late because she was preparing a resume the night before. However, at the Human Resources meeting, Clover had told Hollingsworth that she was late because she ran an errand for her nephew. Thereafter, Jones recommended that Clover be terminated immediately, but Miller disagreed. He said he would look into the possibility of finding a job for Clover in another department.

The next day, Miller informed Clover he was terminating her employment because she had given conflicting explanations for her tardiness. Miller said he had learned from Hollingsworth that Clover had told her she was late to the Human Resources meeting because she had an errand to run for her nephew, which conflicted with the explanation Clover gave him, namely that she had been up late preparing her resume. After some discussion, Miller agreed to reconsider his decision if Clover could work out her differences with Hollingsworth. Clover subsequently met with Hollingsworth, but they failed to reach an agreement. Hollingsworth called Clover on March 27, 1995 to tell her that Miller was terminating her because she had given "false information."

Clover subsequently sued TSYS, alleging unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a). Specifically, she claimed that TSYS terminated her in retaliation for her participation in the investigation of the sexual harassment allegations against Pettis and for her opposition to that alleged sexual harassment. A jury found in Clover's favor and awarded her $25,000 in compensatory damages and $160,000 in punitive damages. TSYS filed a motion for judgment as a

matter of law on Clover's retaliation claim and her claim for compensatory damages. The district court denied that motion and TSYS appealed.

## II. STANDARD OF REVIEW

We review de novo a denial of judgment as a matter of law. See, e.g., Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).

## III. DISCUSSION

TSYS contends that the district court erred in denying it judgment as a matter of law on Clover's retaliation claim. Its contention potentially raises three issues: (1) whether the district court erred in concluding Clover presented sufficient evidence for the jury to find that Clover engaged in statutorily protected conduct under 42 U.S.C. § 2000e-3(a); (2) whether the district court erred in concluding Clover presented sufficient evidence for the jury to find that Clover established the requisite causal connection between her protected conduct and her termination; and (3) whether the district court erred in concluding Clover presented sufficient evidence for the jury to find that TSYS' proffered nondiscriminatory reason for Clover's termination was a pretext for discrimination. For the reasons discussed below, we conclude that Clover engaged in statutorily protected conduct under § 2000e-3(a)'s participation clause, but that TSYS was entitled to judgment as a matter of law because Clover failed to present sufficient evidence to establish the requisite causal link between her protected conduct and her termination. In light of our decision that Clover failed to establish causation, we need not decide whether Clover presented sufficient evidence of pretext.

A. WHETHER THE DISTRICT COURT ERRED IN CONCLUDING CLOVER PRESENTED SUFFICIENT EVIDENCE FOR THE JURY TO FIND THAT CLOVER ENGAGED IN STATUTORILY PROTECTED CONDUCT

4

The statutory provision that Clover asserts prohibited TSYS from taking adverse employment action against her, 42 U.S.C. § 2000e-3(a), recognizes two forms of statutorily protected conduct. An employee is protected from discrimination if (1) "he has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause). 42 U.S.C. § 2000e-(3)a. The case was submitted to the jury under both clauses, and Clover contends that the facts presented at trial support a verdict in her favor under either clause. We believe that although Clover's conduct was not protected by the opposition clause, it did fall within the scope of the participation clause.

1.     <u>Did Clover Engage in Protected Conduct Under the Opposition Clause?</u>

Clover contends that the statements she made in her meeting with Hollingsworth and Calhoun constituted opposition to an unlawful employment practice, namely, sexual harassment. At the meeting, Clover says she "described acts that she believed to have been inappropriate or unusual behavior for a member of senior management [i.e., Pettis]." Specifically, she testified that she told Hollingsworth and Calhoun that Pettis engaged in the following conduct:

(i) Pettis made frequent visits without any "business purpose" to Waters' work area.

(ii) Pettis would call Waters on her personal beeper during work hours.

(iii) Pettis would sometimes knock on the department door where Waters, Clover and other employees worked "to get Waters' attention and to call Waters out into the hall to talk." However, if Clover or another worker looked up, "Pettis would dart behind the door out of sight."

(iv) Pettis hung up "the phone on anybody who answered other than Waters during the day."

(v) Waters responded "to the attention of Pettis in a flirting kind of style."

5

Clover claims that her answers and statements during the interview constitute opposition to an unlawful employment practice. We assume for present purposes that answering questions in such an interview can constitute "opposition."

The parties agree that an employee who seeks protection under the opposition clause must have a "good faith, reasonable belief" that her employer has engaged in unlawful discrimination. See Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997). TSYS concedes that Clover had a good faith belief that TSYS engaged in unlawful sexual harassment, but argues that her belief was not objectively reasonable. We agree.

The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. See Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 n.2 (11th Cir. 1998) (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry").

To establish a hostile environment claim premised on sexual harassment, a plaintiff must establish, among other things, that the harassment occurred because of her sex, and "that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." Watkins v. Bowden, 105 F.3d 1344, 1355 (11th Cir. 1997). Clover contends that her belief that Pettis engaged in sexual harassment attributable to TSYS was objectively reasonable "based on the nature of [Pettis'] conduct in connection with [Waters,] a seventeen year old high school student combined with Pettis' position in the company [as an assistant vice-president.]" However, the disparity between Pettis' and Waters' ages and positions in the company does not make Clover's belief objectively reasonable. None of the conduct that

6

Clover described comes anywhere near constituting sexual harassment, regardless of the relative positions of the employees involved. As the Supreme Court recently stated:

> [T]he statute does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex. The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment.

Oncale v. Sundowner Offshore Servs., Inc., 118 S. Ct. 998, 1002-03 (1998). The Supreme Court has said that the conduct in question must be severe or pervasive enough that a reasonable person would find it hostile or abusive. That requirement is crucial "to ensur[ing] that courts and juries do not mistake ordinary socializing in the workplace–such as . . . intersexual flirtation–for discriminatory 'conditions of employment.'" Id. at 1003.

We do not mean to hold that the conduct opposed must actually be sexual harassment, but it must be close enough to support an objectively reasonable belief that it is. The conduct Clover described misses the mark by a country mile. It follows that Clover's belief the conduct created a sexually hostile environment for Waters was not objectively reasonable. Similarly, Clover could not have formed an objectively reasonable belief that Pettis, or anyone else, had subjected Waters to quid pro quo sexual harassment because she failed to relate any facts at all supporting such a claim.

Nor does the fact that Pettis engaged in conduct which led Waters to file an EEOC complaint and for the company to initiate an in-house investigation alter our conclusion that Clover could not have held an objectively reasonable belief she was opposing an unlawful employment practice. To begin with, the company's in-house investigation, which began before Clover was interviewed, was

7

not based on anything Clover said but instead was a response to  the EEOC complaint Waters had filed.

Moreover, for purposes of determining whether Clover satisfied the objective reasonableness component of the test it is critical to distinguish between the conduct that Clover opposed, i.e., what she saw or heard and then reported during the in-house interview, and the actual conduct Waters experienced and reported in her complaint to the EEOC.  There is nothing in the record to suggest that the two are the same.  For opposition clause purposes, the relevant conduct does not include conduct that actually occurred–or that was averred in an EEOC complaint by the alleged victim–but was unknown to the person claiming protection under the clause.  Instead, what counts is only the conduct that person opposed, which cannot be more than what she was aware of.   Additional conduct or allegations unknown to the opposing person are not relevant to the opposition clause inquiry.  Clover's belief that the conduct she described created a sexually hostile environment was objectively unreasonable.  Therefore, she did not engage in statutorily protected conduct under the opposition clause.[2]

2.      Did Clover Engage in Protected Conduct Under the Participation Clause?

---

[2]We also reject the EEOC's argument, raised for the first time in an amicus brief filed with Clover's petition for rehearing, that TSYS' decision to conduct an in-house investigation in response to the notice of charge of discrimination  made it objectively reasonable for Clover to believe she was opposing unlawful discrimination.  As we pointed out above, the objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law. See Harper, 139 F.3d at 1388 n.2.  While the fact that TSYS was conducting an investigation may have contributed to Clover's subjective belief that she was opposing unlawful discrimination, TSYS' decision to conduct such an inquiry has no bearing on the issue of whether the conduct Clover was "opposing" by answering questions during TSYS' investigation was an unlawful employment practice as measured against the existing substantive law.

As we mentioned earlier, in response to receiving the notice of Waters' charge of discrimination from the EEOC, TSYS commenced an investigation into the merits of that charge. Clover participated in that investigation by answering questions concerning her knowledge of the office interaction between Waters and Pettis. Clover contends that she engaged in statutorily protected conduct under the participation clause because her participation in TSYS' investigation constitutes "participat[ion] in any manner in an investigation . . . under this subchapter [i.e., subchapter VI of Chapter 21 of Title 42 (42 U.S.C. § 2000e)]." 42 U.S.C. § 2000e-3(a). TSYS, on the other hand, contends that Clover did not engage in protected conduct because she simply participated in an internal employer investigation, which is not "participat[ion] in any manner in an investigation . . . under this subchapter." It relies upon dicta from Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir. 1978), that participation conduct is "participation in the machinery set up by Title VII to enforce its provisions." Thus, the issue we must resolve is whether an employee's participation in an investigation conducted by her employer in response to an EEOC notice of charge of discrimination is "participat[ion] in any manner in an investigation . . . under this subchapter."

In addressing that issue, we begin by noting that although subchapter VI of chapter 21 of title 42 does not define the term "investigation . . . under this subchapter," it is clear that, at a minimum, the term encompasses EEOC investigations of alleged unlawful discrimination. See 42 U.S.C. § 2000e-5(b) ("Whenever a charge is filed by . . . a person . . . alleging that an employer . . . has engaged in an unlawful employment practice, the [EEOC] . . . shall make an investigation thereof.").

In conducting its investigation, the EEOC can of course consider evidence gathered by its own investigators, but the EEOC may also consider evidence from other sources, including employers. The pertinent regulation provides that, "[a]s part of [the EEOC's] investigation, the

9

[EEOC] will accept any statement of position or evidence with respect to the allegations of the charge which . . . the respondent [employer] wishes to submit." 29 C.F.R. § 1601.15(a). In addition, the EEOC's standard form providing an employer with notice of a charge of discrimination expressly informs the employer that any statement of position or evidence the employer submits to the EEOC "will be made a part of the file and will be considered" during the EEOC's investigation. EEOC Form No. 131 (Oct. 1994) ("Notice of Charge of Discrimination").

Thus, an employer receiving a form notice of charge of discrimination knows that any evidence it gathers after that point and submits to the EEOC will be considered by the EEOC as part of the EEOC investigation. Though this is an indirect means of gathering evidence to investigate a charge of discrimination, the EEOC considers employer-submitted evidence on an equal footing with any evidence it gathers from other sources. Because the information the employer gathers as part of its investigation in response to the notice of charge of discrimination will be utilized by the EEOC, it follows that an employee who participates in the employer's process of gathering such information is participating, in some manner, in the EEOC's investigation.

To be sure, this form of participation is more indirect than, for example, an employee giving an interview to the EEOC's own investigators. But Congress chose to protect employees who "participate[] in any manner" in an EEOC investigation. 42 U.S.C. § 2000e-3(a) (emphasis added). The words "participate in any manner" express Congress's intent to confer "exceptionally broad protection" upon employees covered by Title VII. See Pettway v. American Cast Iron Pipe Co., 411 F.2d 998, 1006 n.18 (5th Cir. 1969). As we pointed out in Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997), "the adjective 'any' is not ambiguous. . . . [It] has an expansive meaning, that is, one or some indiscriminately of whatever kind. . . . [A]ny means all." (internal

10

quotations and citations omitted). Because participation in an employer's investigation conducted in response to a notice of charge of discrimination is a form of participation, indirect as it is, in an EEOC investigation, such participation is sufficient to bring the employee within the protection of the participation clause.[3]

Our previous opinion erred by its exclusive focus on whether the employee was participating in an EEOC investigation or an internal investigation conducted by the employer. Here, we recognize that, at least where an employer conducts its investigation in response to a notice of charge of discrimination, and is thus aware that the evidence gathered in that inquiry will be considered by the EEOC as part of its investigation, the employee's participation is participation "in any manner" in the EEOC investigation. Accordingly, by participating in her employer's investigation conducted in response to an EEOC notice of charge of discrimination, Clover engaged in statutorily protected conduct under the participation clause.

B. WHETHER THE DISTRICT COURT ERRED IN CONCLUDING CLOVER PRESENTED SUFFICIENT EVIDENCE FOR THE JURY TO FIND THAT CLOVER ESTABLISHED THE REQUISITE CAUSAL CONNECTION BETWEEN HER PROTECTED CONDUCT AND HER TERMINATION

In order to prevail on a retaliation claim, a plaintiff must establish the requisite causal connection between her statutorily protected conduct and the adverse employment action. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). To establish that causal connection, a plaintiff need only show "that the protected activity and the adverse action were not wholly unrelated." Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985).

_____

[3] We have no occasion to decide in this case whether the participation clause extends to cover an employee's participation in an investigation conducted by her employer before receiving a notice of charge of discrimination from the EEOC.

11

"At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." Goldsmith, 996 F.2d at 1163 (internal citations omitted).

In this case, TSYS contends Clover failed to present sufficient evidence for a jury to conclude that Clover established the requisite causal connection between her protected conduct--i.e., her participation in the investigation of Waters' sexual harassment claim against Pettis--and her termination. Specifically, TSYS argues Miller was the only decision-maker responsible for Clover's termination and Clover failed to present evidence that he was aware of Clover's protected conduct at the time he terminated her.

Clover offers two arguments in response. First, she says Miller was aware of Clover's protected conduct and his awareness, combined with the temporal proximity of that protected conduct to her termination, are sufficient to establish causation. Second, Clover says there was sufficient evidence for the jury to find Hollingsworth was also a decision-maker in her termination and Hollingsworth's undisputed awareness that Clover had engaged in protected conduct combined with the temporal proximity of her protected conduct to her termination, are sufficient evidence to establish causation.

If Clover is correct that there was sufficient evidence to show that either (1) Miller was aware of her protected conduct or (2) Hollingsworth was a decision-maker, then she created a jury issue on the causal link requirement of her retaliation claim. See Goldsmith, 996 F.2d at 1163-64 (awareness by decision-maker of protected conduct, in conjunction with temporal proximity of adverse employment action to protected conduct, is sufficient to create a factual issue about the

12

causal link requirement).  However, for the reasons set forth below, we conclude that there was insufficient evidence to support either theory of causation.

With regard to her first theory, Clover concedes that there is no direct evidence Miller was aware of her participation in the investigation of Waters' sexual harassment claim against Pettis. Miller unequivocally denied being aware of it.  In the face of that denial, Clover offers the following circumstantial evidence in her effort to establish that Miller was aware of her protected conduct:

(i)  Miller was Pettis' friend and manager.

(ii) Prior to his decision to terminate Clover, Miller knew Pettis had been investigated about something, but did not know the details.

(iii)  Miller spoke with Hollingsworth, at some point after Clover participated in the investigation on March 23 but before Miller informed Clover she was being terminated March 24.

Clover argues that a jury could infer Miller knew that Pettis was being investigated for sexual harassment from the fact he was Pettis' friend and manager and Miller's admission that he knew Pettis had been investigated about something.  Clover further argues that given the timing of Miller's conversation with Hollingsworth--i.e., shortly after Clover met with Hollingsworth as part of the investigation and shortly before Miller decided to terminate Clover--a reasonable jury could infer that Hollingsworth told Miller that Clover had participated in the investigation of Pettis.  Thus, Clover contends she presented sufficient evidence to establish Miller's awareness of her protected conduct.

Clover cites our decision in Goldsmith v. City of Atmore, 996 F.2d 1155 (11th Cir. 1993), to support her argument.  In that case, Goldsmith, a black employee of the City of Atmore, sought

13

to prove that she had been transferred by the mayor in retaliation for engaging in conduct protected under Title VII. Goldsmith had applied for a position as city clerk. After learning the position would be filled by a white female, Goldsmith informed one of the city council members that she was going to file an EEOC complaint. The next morning the council member met with the city's mayor. After the meeting, the mayor met with Goldsmith and told her the clerk position she sought was filled and "there was nothing [Goldsmith] could do about it." Id. at 1157. Three weeks later the mayor told Goldsmith to clean out her desk, because she had been transferred to the city library. See id.

A key issue at trial and on appeal was whether Goldsmith had presented sufficient evidence to establish that the mayor was aware of her protected activity–i.e., her complaints to the council member and threat to file an EEOC complaint. At trial, the mayor denied talking about Goldsmith during his meeting with the councilman but was impeached by his deposition testimony stating that he "may" have discussed Goldsmith's complaints during their meeting. See id. at 1363 & n. 12. We held that those facts were sufficient for a jury to find that the mayor was aware of the employee's protected activity for purposes of satisfying the causal link requirement of Goldsmith's retaliation claim. See id. According to Clover, the evidence she presented was sufficient, under Goldsmith, for a reasonable jury to find that Miller was in fact aware of her protected conduct. We disagree.

Although Clover's evidence raises the inference that Miller was aware, in some fashion, that TSYS was investigating Pettis, that evidence is insufficient for any reasonable jury to find that Miller was aware of Clover's participation in that investigation when he decided to terminate her. The evidence that Miller and Hollingsworth spoke in the time period between Clover's participation in the investigation and Miller's decision to terminate her shows, at most, that Hollingsworth could

14

conceivably have told Miller about Clover's participation. But because "could have told" is not the same as "did tell," it would be pure speculation to infer that Hollingsworth actually told Miller about Clover's participation. The fact that the vice-president who heads a corporate division and the vice-president in charge of Human Resources talk regularly is not surprising, nor is it enough to support a reasonable inference that they discussed a specific topic, much less an inference concerning what they said about it. A jury finding that Miller was aware of Clover's protected conduct must be supported by reasonable inferences from the evidence, not mere speculation.

Goldsmith is not to the contrary. In that case, plaintiff Goldsmith had evidence to impeach the mayor's denial that he had discussed her protected conduct with the councilman. In contrast, Clover offered no evidence to impeach Miller's unequivocal denial that he had any knowledge of Clover's participation in the Pettis investigation or that he had ever discussed the subject with Hollingsworth. Nor did Clover even ask Hollingsworth during the trial if she had told Miller about Clover's participation in the investigation. Clover did not introduce any evidence that it would have been Hollingsworth's standard practice to inform Miller his subordinates were involved in investigations conducted by Human Resources. Accordingly, we conclude that Clover failed to present sufficient evidence to establish that Miller was aware of her protected conduct.[4]

With regard to her second theory of causation, Clover relies primarily on two pieces of evidence to support her position that Hollingsworth was a decision-maker. We find neither persuasive. First, she points to Hollingsworth's testimony that it was the general practice of the

---

[4]Clover also asserts that Miller knew of Clover's participation in the investigation because Jones, Clover's immediate supervisor, told him. That assertion, however, is mere speculation. Even assuming Jones knew of Clover's participation, there is no evidence that Jones told Miller.

15

Human Resources Department, of which Hollingsworth was Assistant Vice-President, to review and evaluate termination decisions at TSYS. Clover argues that Hollingsworth's role in reviewing and evaluating termination decisions was enough for a reasonable jury to infer that she was a decision-maker in TSYS' termination of Clover. The problem with that argument, however, is that Hollingsworth did not testify that she actually had the authority to overrule the decision of Miller, a senior vice-president, to terminate Clover. Nor did Clover present any evidence showing Hollingsworth had such authority. Furthermore, the undisputed testimony of both Hollingsworth and Miller was that Hollingsworth made no recommendation at all to Miller concerning whether he should terminate her. There is no evidence to contradict that unequivocal testimony.

Second, Clover points to her testimony that Miller told her that he would revoke his decision to terminate her if she could work out her differences with Hollingsworth concerning the scheduled time of Clover's March 23 meeting with the Human Resources. According to Clover, she did work out those differences, and Hollingsworth promised to tell Miller. Although Clover argues that this made Hollingsworth a decision-maker in her termination, we cannot agree. At most, the evidence shows Hollingsworth supplied Miller with information (apparently favorable to Clover) which he may or may not have considered in making his decision to terminate Clover. It does not show that Hollingsworth made the decision. To the contrary, Clover's own testimony was that when Hollingsworth called her on March 27, 1995, Hollingsworth told her that it was <u>Miller</u> who had decided to terminate her for falsifying information. Accordingly, we conclude that Clover failed to present sufficient evidence to establish that Hollingsworth was a decision-maker in her termination.[5]

---

[5]Clover does not contend that anybody besides Hollingsworth and Miller were possible decision-makers in her termination.

16

In sum, because Clover failed to present sufficient evidence either that (1) Miller was aware of her protected conduct or (2) anyone other than Miller was a decision-maker, we conclude she did not present sufficient evidence to permit a jury to reasonably find the requisite causal connection between her protected activity and her termination. Because Clover was required to establish that causal connection in order to prevail on her retaliation claim, the district court erred in denying TSYS' motion for judgment as a matter of law.

## IV. CONCLUSION

The judgment is REVERSED.

17