**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff,

v.

**Scott K. GINSBURG, Defendant.**

**Nos. 99–8694–CIV–RYSKAMP,
99–8694–CIV–VITUNAC.**

United States District Court,
S.D. Florida,
West Palm Beach.

Dec. 19, 2002.

Johnson, Jr., DeMaurice F. Smith, Justin R. Rhoades, Latham & Watkins, Washington, DC, for Mark J. Ginsburg.

James Francis Carroll, Conrad & Scherer, Fort Lauderdale, FL, Ronald Bennett Ravikoff, Steven Elliot Chaykin, Zuckerman Spaeder Taylor & Evans, Miami, FL, David A. Becker, Matthew T. Martens, Michael Chertoff, Everett C. Johnson, Jr., DeMaurice F. Smith, Justin R. Rhoades, Latham & Watkins, Washington, DC, Glenn Laurence Widom, Hanzman Criden Chaykin & Rolnick, Coral Gables, FL, for Jordan E. Ginsburg.

### ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

RYSKAMP, District Judge.

THIS CAUSE comes before the Court pursuant to Defendant Scott K. Ginsburg's Renewed Motion for Judgment as a Matter of Law, filed July 22, 2002 [DE 264]. Plaintiff, the United States Securities and Exchange Commission, responded on August 28, 2002 [DE 270]. Defendant replied on September 13, 2002 [DE 273]. This matter is now ripe for adjudication.

### I. BACKGROUND

On September 9, 1999, Plaintiff, the United States Securities and Exchange Commission ("SEC") brought this action against Defendants Scott K. Ginsburg ("Scott Ginsburg"), Mark J. Ginsburg ("Mark Ginsburg") and Jordan E. Ginsburg ("Jordan Ginsburg") for insider trading in violation of federal securities laws. During the relevant time period, Scott Ginsburg was the chairman of the board and CEO of Evergreen Media Corporation ("Evergreen"), which owned and operated

Yuri B. Zelinsky, Luis R. Mejia, Paul Sharratt, Securities and Exchange Com'n, Washington, DC, for U.S. Securities and Exchange Com'n.

James Francis Carroll, Conrad & Scherer, Fort Lauderdale, FL, Ronald Bennett Ravikoff, Walter, J. Tache, Zuckerman Spaeder Taylor & Evans, Miami, FL, David A. Becker, Matthew T. Martens, Michael Chertoff, Everett C. Johnson, Jr., DeMaurice F. Smith, Justin R. Rhoades, Latham & Watkins, Washington, DC, for Scott K. Ginsburg.

William R. Scherer, James Francis Carroll, Conrad & Scherer, Fort Lauderdale, FL, Ronald Bennett Zuckerman Spaeder Taylor & Evans, Miami, FL, Edward M. Kay, Edward M. Kay, P.A., Fort Lauderdale, FL, David A. Becker, Matthew T. Martens, Michael Chertoff, Everett C.

various radio stations nationwide. Mark Ginsburg is Scott Ginsburg's brother, who lives next door to their father, Jordan Ginsburg, who was a founder of Evergreen.

The Complaint charged Scott Ginsburg with three counts of violating the Securities Exchange Act of 1934 ("the Act"). Count I of the complaint, brought under Section 10(b) of the Act and Rule 10b–5 thereunder, involves a series of alleged tips in July 1996 from Scott Ginsburg to Mark Ginsburg or Jordan Ginsburg and from Mark Ginsburg to Jordan Ginsburg of material, nonpublic information regarding Evergreen's attempt to acquire EZ Communications, Inc. ("EZ"), another radio broadcasting corporation. The SEC alleges that on either the same or following day after each alleged tip, Mark Ginsburg and Jordan Ginsburg each placed substantial orders for EZ stock. When EZ announced its merger in August 1996, Mark Ginsburg and Jordan Ginsburg traded their EZ stock and realized gains of $664,024 and $412,875, respectively.

Count II of the Complaint, brought under Section 10(b) and Rule 10b–5 thereunder, and Count III, brought under Section 14(e) and Rule 14e–5 thereunder, concern another alleged tip from Scott Ginsburg to Mark Ginsburg regarding plans for a tender offer to Katz Media Group, Inc. ("Katz") by Evergreen and Chancellor Broadcasting. As with the EZ transaction, Mark Ginsburg placed a substantial order for Katz stock on the same day he was allegedly tipped and realized a gain of $729,200 after the public announcement of the tender offer in July, 1997.

Prior to the start of trial, Defendants Mark Ginsburg and Jordan Ginsburg entered into settlement agreements with the SEC. Scott Ginsburg did not enter into a settlement agreement with the SEC and proceeded to trial in April, 2002. At the conclusion of the SEC's case in chief, Scott Ginsburg moved for judgment under Rule 50 of the Federal Rules of Civil Procedure on the grounds that the evidence the SEC produced was insufficient and thus no reasonable jury could have concluded, absent impermissible speculation, that the SEC had met its burden of proof. At the close of all the evidence, Scott Ginsburg renewed his Rule 50 motion, again arguing that the evidence was insufficient to support the verdict. These motions were denied.

At the conclusion of the seven day trial, the jury found that Scott Ginsburg violated sections 10(b) and 14(e) of the Act and Rules 10b–5 and 14e–3 thereunder, based on his alleged tips to, and the trading by, Mark Ginsburg and Jordan Ginsburg in the common stock of EZ and Katz. In reaching its verdict, the jury relied on the SEC's circumstantial evidence consisting of dates of meetings between Scott Ginsburg and certain other radio company executives, records of phone calls between numbers registered to Scott Ginsburg and numbers registered to Mark Ginsburg and Jordan Ginsburg, and dates of trades in EZ and Katz by Mark Ginsburg and Jordan Ginsburg.

In its July 8, 2002 [DE 263] Order, the Court found that the appropriate relief against Scott Ginsburg was a one-million dollar civil penalty. On July 22, 2002 [DE 264], Scott Ginsburg renewed his motion for judgment as a matter of law Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, arguing that the jury's verdict for the SEC was based on speculation as to the content of the phone calls between members of the Ginsburg family.

## II. *LEGAL STANDARD ON RE-NEWED MOTIONS FOR JUDG-MENT AS A MATTER OF LAW*

 Scott Ginsburg's Renewed Motion for Judgment as a Matter of Law is

governed by Rule 50(b) of the Federal Rules of Civil Procedure, which provides, in relevant part:

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment....

When reviewing a Rule 50(b) motion, this Court must examine all of the evidence presented at trial and draw all reasonable inferences in the light most favorable to the nonmoving party. *George v. GTE Directories Corp.*, 195 F.R.D. 696, 698 (M.D.Fla., 2000) (citing *Montgomery v. Noga*, 168 F.3d 1282, 1289 (11th Cir.1999)). This Court is not at liberty to re-weigh the evidence, make credibility judgments or substitute its judgment for that of the jury. *George*, 195 F.R.D. at 698. The Court may not grant the motion if reasonable minds could disagree regarding the import of the evidence, but the Court must grant the motion if "there can be but one reasonable conclusion as to the verdict." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted)).

### III. DISCUSSION

Under Section 10(b) of the Act, it is unlawful for any person to employ devices, schemes or artifices to defraud; make untrue statements of material facts or omit to state material facts necessary to make the statements in the light of the circumstances under which they were made, not misleading; or engage in acts, practices or courses of business that operate as a fraud or deceit upon other individuals. 15 U.S.C. § 78j(b). Under Section 14(e) of the Act, it is unlawful for a person who possesses material information relating to a tender offer to purchase a company to buy or sell securities in the company that is the subject of the tender offer. 15 U.S.C. § 78n(e).

### A. Direct and Indirect Evidence in SEC Fraud Cases

The SEC must prove violations of Section 10(b) by a preponderance of the evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Proof by a preponderance of the evidence is "proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." *McCormick on Evidence*, § 339 (5th ed.1999). The SEC may use direct or circumstantial evidence to meet its burden. *See Herman & MacLean*, 459 U.S. at 389 n. 30, 103 S.Ct. 683.

"Direct evidence is evidence which, if believed, proves the existence of a fact without inference or presumption." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir.2002) (citation omitted). *See also Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir.1990) (if believed, direct evidence establishes the fact in question "without inference or presumption.") (quoting *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir.1989)). On the other hand, circumstantial evidence is indirect evidence that is "based on inference and not on personal knowledge or observation." *Black's Law Dictionary*, 576 (7th ed.1999). Even if a factfinder accepts circumstantial evidence as true, "additional reasoning is required to reach the proposition to which it is directed."

*City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 565 (11th Cir.1998) (citing *McCormick on Evidence* § 185 (4th ed.1992)). A jury need not give direct evidence more weight that circumstantial evidence, indeed, "[c]ircumstantial evidence has no less weight than direct evidence as long as it reasonably establishes that fact rather than anything else." *Burrell v. Bd. of Trustees of Ga. Military College*, 970 F.2d 785, 788 (11th Cir.1992). *See also United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989) ("Circumstantial evidence, it should be noted, if relied upon by the jury, is of no lesser probative value than direct evidence."), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).

It is well established that the SEC need not present direct evidence to warrant a verdict against a defendant trader. "[P]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession." *SEC v. Singer*, 786 F.Supp. 1158, 1164 (S.D.N.Y. 1992) (quoting *SEC v. Bluestone*, No. 90–72525, 1991 WL 83960, at *1 (E.D.Mich. Jan.24, 1991)). *See also Herman*, 459 U.S. at 389, 103 S.Ct. 683 (noting that the difficulty of proving a trader's state of mind counsels against requiring a higher standard of proof in 10(b) cases and that circumstantial evidence "can be more than sufficient" to "prov[e] the defendant's state of mind."). The Eleventh Circuit held that circumstantial evidence is an appropriate method of proof in SEC fraud cases in *SEC v. Adler*, 137 F.3d 1325, 1337 (11th Cir.1998), in stating that "when an insider trades while in possession of material non-public information, a strong inference arises that such information was used by the insider in trading." Despite defendants' denials and protestations that they

had pre-existing plans to divest themselves of Comptronix stock, the Eleventh Circuit held that the SEC presented sufficient circumstantial evidence in the form of the timing of phone calls and stock trades to warrant a jury verdict against defendants.

Circumstantial evidence is not always sufficient to warrant a verdict in favor of the SEC, however. In *SEC v. Gonzalez de Castilla*, 184 F.Supp.2d 365 (S.D.N.Y. 2002), the Court found that the inside information in question did not yet exist at the time of the alleged tip and that there was no evidence of any telephone call or other communication between the tipper and any insider during the relevant time period. Furthermore, the majority of the trades at issue occurred before the alleged tipper could have gained access to material non-public information.

In *SEC v. Truong*, 98 F.Supp.2d 1086 (N.D.Cal.2000), the Court granted partial summary judgment on the grounds that there was insufficient evidence that the tipper had inside information at the time of the alleged tip. Yet the Court denied summary judgment regarding another claim in which the SEC presented evidence of suspicious trading occurring after the tipper had access to inside information.

The Court does not dispute that circumstantial evidence is an appropriate means of proving insider trading in SEC fraud cases. The Court is deeply concerned, however, about the Eleventh Circuit's inconsistent pronouncements of when circumstantial evidence is sufficient to justify an inference of wrongdoing and when circumstantial evidence is so lacking that any finding of wrongdoing is mere speculation.

**B.** ***The Eleventh Circuit's Inconsistent Treatment of Circumstantial Evidence***

Eleventh Circuit precedent is inconsistent as to the amount of circumstantial

evidence necessary to justify an inference of wrongdoing. The cases discussed in this order demonstrate that the Eleventh Circuit appears to require more compelling circumstantial evidence of wrongdoing in employment discrimination cases than it does in SEC fraud cases. The Court sees no reason to require lesser circumstantial evidence of wrongdoing in SEC civil fraud cases than in employment discrimination cases; both are civil actions subject to the preponderance of the evidence standard of proof.

In *Burrell v. Bd. of Trustees of Ga. Military College,* 970 F.2d 785, 789 (11th Cir.1992), the Eleventh Circuit held that a prima facie case of conspiracy under 42 U.S.C. §§ 1983 and 1985(3) could rest on circumstantial evidence, but ruled that Plaintiff presented insufficient circumstantial evidence to prove the existence of such conspiracy. The relevant events in this case occurred in the town of Milledgeville, Georgia. *Id.* at 790. Milledgeville is home to the Georgia Military College ("GMC"), a public institution that relies heavily on state funds, but nevertheless charges some tuition. *Id.* The Mayor of Milledgeville, James Baugh, was the chairman of the GMC Board. *Id.* Jacob Goldstein was a GMC board member. *Id.* Plaintiff was senior vice president of the First Federal Savings and Loan Association of Milledgeville. *Id.* Alva Baggarly was First Federal's president and CEO. *Id.* At 791. Goldstein, Baggarly and Plaintiff were also on First Federal's Board. *Id.* at 790.

Plaintiff was suspected of writing an anonymous letter to the editor of *The Atlanta Constitution* critical of the level of public assistance received by GMC. *Id.* at 790–91. Soon after the publication of the anonymous letter, Goldstein told Plaintiff that Baugh believed she had sent the let-

ter and that they hoped she would not do anything against the interests of GMC. *Id.* at 791. Approximately one year later, Plaintiff wrote a signed letter to the editor of a Milledgeville paper that criticized GMC for receiving public funds while still charging tuition, advancing racial segregation, and practicing racial discrimination in hiring. *Id.* News of the letter reached the pages of *The Macon Telegraph* and *The Atlanta Constitution.* *Id.* Shortly after the story broke, First Federal lost approximately $100,000 in deposits, with Goldstein's brother withdrawing approximately ninety percent of the amount. *Id.*

While the GMC controversy was brewing, Plaintiff was also experiencing conflict with Baggarly over their respective job responsibilities. *Id.* at 791. The two decided to bring their grievances to the First Federal board. *Id.* The day after the board meeting, Baggarly terminated Burrell. *Id.* at 792.

Also during the GMC controversy, but prior to the First Federal board meeting, Baggarly met Baugh in Baugh's city hall office. *Id.* n. 15. Both flatly deny that they discussed Plaintiff, and Plaintiff admitted that she did not know what they discussed at the meeting. *Id.*

Plaintiff claimed that her termination was in retaliation for her public criticism of GMC. The Eleventh Circuit noted that, while circumstantial evidence could sustain a claim of the existence of a conspiracy, Plaintiff had not alleged sufficient facts to prove the existence of a conspiracy in her case. In the words of the Court,

Considering that [Plaintiff] cannot offer evidence of the contents of Baugh's and Baggarly's meeting, that Baugh and Baggarly provide a reasonable and consistent explanation for their meeting,

that Baugh and Baggarly flatly deny having discussed [Plaintiff], only one fact can be inferred from their meeting: that the meting took place. *Any conclusion about the content of their discussion in contradiction to their testimony would qualify as speculation, not inference.* In sum, the naked fact of Baugh's and Baggarly's meeting, considered independently or in conjunction with all other inferable facts in the record, does not permit the inference that Baugh and Baggarly conspired to have [Plaintiff] fired.

*Id.* (Emphasis added). Evidence that Baugh and Baggarly *could* have discussed Plaintiff at the meeting was insufficient to prove that they *actually* discussed Plaintiff. A conclusion that Baugh and Baggarly discussed Plaintiff at the meeting would be impermissible speculation on the part of a factfinder.

The Eleventh Circuit adopted identical reasoning in *Clover v. Total System Services, Inc.,* 176 F.3d 1346 (11th Cir.1999). In *Clover,* an employment discrimination case, the Court held that the mere opportunity to communicate confidential information regarding an employee's engaging in protected conduct did not compel an inference that confidential information was actually communicated.

On March 22, 1995, Plaintiff was asked to report to Defendant's Human Resources office across town for a meeting the next day. *Id.* at 1348. Plaintiff apparently believed the meeting was scheduled for 9:15; she arrived shortly thereafter. *Id.* At the meeting, a human resources officer and defendant's legal counsel informed Plaintiff that they were investigating allegations of sexual harassment and inquired whether she had any knowledge about certain employees' office interactions. *Id.* The meet-

ing lasted approximately 30 to 40 minutes. *Id.*

On her way back to her office, Plaintiff stopped at her house to retrieve her forgotten wallet. *Id.* She returned to her office at 10:45 a.m., when a supervisor, who knew she had been at the morning meeting, informed her that her frequent tardiness was becoming a problem. *Id.* On March 27, 1995, Plaintiff was informed that she was being terminated for her tardiness. *Id.* Plaintiff sued, claiming that her termination was in retaliation for participating in the sexual harassment investigation. *Id.* Plaintiff argued that a jury could infer that the decision maker who terminated her was aware of her participation in the investigation because he was friends with the individual under investigation and because the decision maker spoke with the human resources officer after the March 23 meeting but prior to her termination. *Id.* at 1354–55. The jury returned a verdict for Plaintiff, after which Defendant moved for judgment as a matter of law. *Id.* at 1350. The district court denied the motion, and Defendant appealed. *Id.*

The Eleventh Circuit reversed the denial of judgment as a matter of law, holding that the evidence was insufficient to support a jury verdict that Plaintiff was terminated for participating in the investigation. *Id.* at 1355. The Eleventh Circuit held that the opportunity to share the information did not necessarily mean that the information was shared:

> [B]ecause "could have told" is not the same as "did tell," it would be pure speculation to infer that [the human resources officer] told [the decision maker] about Clover's participation. The fact that the vice-president who heads a corporate division and the vice-president in charge of Human Resources talk regu-

larly is not surprising, nor is it enough to support a reasonable inference that they discussed a specific topic, much less an inference concerning what they said about it. *A jury finding that [the decision maker] was aware of [Plaintiff's] protected conduct must be supported by reasonable inferences from the evidence, not mere speculation.*

*Id.* at 1355 (emphasis added). Although the decision maker had the opportunity to learn of the confidential information, Plaintiff could not prove that he actually received the information. Absent additional evidence in support of Plaintiff's theory, a jury verdict that her termination was retaliatory was unwarranted.

In *Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791 (11th Cir.2000), the Eleventh Circuit accepted at face value the unrebutted testimony of a decision maker that he was unaware of an employee's protected conduct at the time of making the adverse employment decision. Plaintiff was to begin three weeks of scheduled FMLA leave on July 10, 1997. *Id.* at 794. Early in July, Defendant hired a new top-tier manager who oversaw Plaintiff's immediate supervisor. *Id.* When Plaintiff's supervisor told the top-tier manager of Plaintiff's current and previous issues with poor work performance, the manager decided to terminate Plaintiff. *Id.* The termination occurred the day before Plaintiff's scheduled leave was to begin. *Id.* Plaintiff claimed that her termination was in retaliation for her planned medical leave, but the manager testified that he was unaware of Plaintiff's scheduled leave when he decided to terminate her. *Id.* Plaintiff failed to produce any evidence to contradict that assertion. *Id.* The Eleventh Circuit affirmed the granting of summary judgment for the employer, noting that "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.* at 799. Although the timing of the decision may have appeared suspect, absent additional evidence tending to show that the manager was aware of Plaintiff's protected conduct, a reasonable jury could not have found that the termination was retaliatory.

Most recently, in *Brochu v. City of Riviera Beach,* 304 F.3d 1144 (11th Cir.2002), the Eleventh Circuit held that a one-day time lapse between protected conduct and an adverse employment decision was not sufficient circumstantial evidence to warrant an inference that the adverse action was retaliatory. Plaintiff, a Lieutenant in the Detective Division of the Riviera Beach Police Department, testified against the police department in an unrelated discrimination suit. *Id.* at 1147–48. As Plaintiff returned to the police station after testifying, a lieutenant paged him and told him that "they" were angry about his testimony and that he would be transferred to midnight road patrol. *Id.* at 1148. The department posted a memo to that effect the next day. *Id.* The Eleventh Circuit noted that the decision maker claimed to be unaware of Plaintiff's conduct at the time of the employment decision and ruled that the coincidence in timing was not sufficient to indicate that the reassignment was in retaliation for Plaintiff's testimony. *Id.* at 1156. According to the Court, Plaintiff's "self-serving belief" that his transfer was retaliatory was not sufficient to sustain his employment discrimination claim. *Id.* The Eleventh Circuit held that the one-day time lapse between Plaintiff's protected conduct and an

adverse employment decision and the unobjected to hearsay statement that "they" were angry with Plaintiff were not sufficient circumstantial evidence to justify an inference that Plaintiff's transfer was retaliatory.

Based on these cases, the Eleventh Circuit appears to be saying that, circumstantial evidence tending to show that the decision maker *could* have been aware of the protected conduct is insufficient to support a finding of wrongful conduct. Subsequent to deciding *Burrell*, however, and prior to deciding *Clover*, *Brungart* and *Brochu*, the Eleventh Circuit decided *Adler*. A close look at *Adler* evinces the Circuit's differing treatment of circumstantial evidence in employment and SEC fraud cases. In *Adler*, the Eleventh Circuit held that circumstantial evidence that the defendant *could* have communicated inside information was sufficient to warrant an inference that the defendant *actually* communicated inside information.

On November 15, 1992, Defendant Richard Adler ("Adler"), an outside director of Comptronix Corporation ("Comptronix"), attended a board meeting via telephone from Taiwan. *Adler*, 137 F.3d at 1329. At this meeting, Adler was asked to investigate the activities of two Comptronix executives for potential fraud. *Id.* Adler's investigation eventually discovered improprieties in the activities of the executives. *Id.* Comptronix made a public announcement to that effect on November 25, 1992, after which the price of its stock plummeted. *Id.*

Adler and Harvey Pegram ("Pegram"), a former Comptronix executive, had been friends and business associates for thirty years. *Id.* On November 16, 1992, the day after Adler attended the board meeting where he learned about the possibility of fraud on the part of Comptronix executives, Pegram called Adler's home in Taiwan at 7:53 a.m. CST. *Id.* at 1329–30. The phone call lasted 72 seconds. *Id.* At 7:55 a.m., Pegram called his wife at home. *Id.* Mrs. Pegram called the Pegrams' stock broker at 8:07 a.m. and placed an order to sell 50,000 shares of Comptronix stock. *Id.* Between November 16 and 24, 1994, the Pegrams sold 150,000 shares of Comptronix stock, avoiding losses of $2,315,365. *Id.* The SEC argued that Adler tipped Pegram in the early morning call on November 16, 1992. *Id.*

All defendants denied possessing non-public material information and claimed that the trades at issue stemmed from a pre-existing plan to sell the securities in question. Nevertheless, the Eleventh Circuit found that the evidence of phone calls among defendants, followed closely in time by trading raised a reasonable inference that the tippees received and used material non-public information and was a sufficient basis from which a jury reasonably could conclude that the defendants possessed and traded on inside information. *Id.* at 1339–44. Significantly, the SEC never established that tipping *actually* occurred during the phone conversations. The Eleventh Circuit held that the SEC's circumstantial evidence that tipping *could* have occurred was sufficient to justify the jury verdict against defendant.

The question before this Court is the same question posed to the district court in *Adler*: "whether there is *substantial* circumstantial evidence or whether the evidence presented by plaintiff is merely speculation seeking rise to substance." *S.E.C. v. Adler*, 1995 WL 822672, at *2 (Oct. 26, 1995 N.D.Ala.). The Court expresses genuine wonder as to what constitutes sufficient circumstantial evidence to

warrant an inference of wrongdoing and queries whether, based on its holdings in *Clover, Brungart* and *Brochu,* the Eleventh Circuit has elected to abandon the precedent it set in *Adler.*

### C. Sufficiency of the Evidence

■ The Court elects to follow Eleventh Circuit's decisions in *Burrell, Clover, Brungart* and *Brochu* and finds that the SEC has not presented sufficient circumstantial evidence to prove that Scott Ginsburg tipped his brother about possible acquisitions of EZ and Katz. Evidence that Scott Ginsburg *could* have communicated inside information to Mark Ginsburg is not evidence that he *did* communicate inside information.

The circumstances surrounding the EZ and Katz stock acquisitions are not in dispute. Prior to July 1, 1996, Scott Ginsburg asked EZ's CEO, Alan Box ("Box") whether EZ would consider some form of business combination with Evergreen. Box's response included statements to the effect that EZ was not for sale at that time. (Pl.Ex. 124 ¶ 6.) Scott Ginsburg met with Box on July 12, 1996. (*Id.* ¶ 7.) On July 15, 1996, a representative of Credit Suisse First Boston contacted Scott Ginsburg and told him that if Evergreen would execute a written confidentiality agreement, it would be provided updated financial information concerning EZ. On July 16, 1996, EZ sent a confidentiality agreement to Evergreen. Scott Ginsburg directed Evergreen's chief financial officer to analyze the information from EZ. (*Id.* ¶ 8.) Scott Ginsburg does not deny that he received information at the meeting with Box to put him on notice that EZ was potentially for sale. Scott Ginsburg testified that at the meeting, he and Box discussed "entity combinations" and Box's

decision to hire a banker to assist with "strategic alternatives." *See* Scott Ginsburg Trial Testimony, April 11, 2002 Trial Tr., at 486. The two also spoke about the possibility of entering a confidentiality agreement to facilitate a transaction and played "fantasy radio," which consisted of "generic" discussion about "us buy you, you buy us, what it would look like." *Id.* at 491, 493. Subsequent to the meeting, from July 14–July 29, a total of 15 phone calls were placed among the residences of Scott, Mark and Jordan Ginsburg. (Pl. Ex. 101.) A total of 48,000 shares of EZ stock were purchased for Mark Ginsburg, Mark Ginsburg and his wife, and Mark Ginsburg's son between July 15–29, 1996. (Pl.Ex. 124, ¶ 16.)

Regarding the Katz acquisition, on February 18, 1997, Evergreen announced that it would merge with Chancellor Broadcasting Corporation ("Chancellor Broadcasting"). (*Id.* ¶ 22.) The merger was complete on September 5, 1997, and the resulting entity was called Chancellor Media Corporation ("Chancellor Media"). Hicks, Muse, Furst & Tate ("Hicks Muse"), an investment firm that owned a majority interest in Chancellor Broadcasting, became the largest shareholder of Chancellor Media. (*Id.* ¶ 23.) On March 20, 1997, while the merger was pending, Scott Ginsburg met with representatives from Hicks Muse. (*Id.* ¶ 25.) On June 16, 1997, Scott Ginsburg met with Stuart Olds, the president of Katz's Radio Division. During that meeting, Olds attempted to encourage Scott Ginsburg to be interested in Katz and asked Scott Ginsburg to contact Katz's chairman for further discussion. (*Id.* ¶ 26.) Scott Ginsburg admitted that he learned at the March 20 meeting that Katz was looking for a buyer. *See* Scott Ginsburg Trial Testimony, April 11, 2002 Trial Tr. (afternoon ses-

sion), at 10. On June 17–18, a total of 131,100 shares of Katz stock were purchased for Mark Ginsburg's son and Mark Ginsburg and his wife. (Pl.Ex. 124, ¶¶ 27, 28.) Ten phone calls were placed among the three residences from June 15–17, 1997. (Pl.Ex. 102.) On July 14, 1997, it was announced that Evergreen and Chancellor Broadcasting would acquire Katz. (*Id.* ¶ 30.) On or about July 16–17, 1997, 132,500 shares of Katz stock were sold from the accounts relating to Mark Ginsburg's son and Mark Ginsburg and his wife. (*Id.* ¶ 31.)

The evidence presented at trial demonstrated that Mark Ginsburg could have learned about the potential acquisitions of EZ and Katz from sources other than his brother. In a June 22, 1996 article in the *Dallas Morning News,* EZ Chief Financial Officer Ron Peele was quoted as stating "If we happen to receive the proverbial 'offer that can't be refused,' we would take it...We are constantly having conversations with other operators about them buying us, us buying them, putting a deal together." The article further characterized EZ as a "likely target" and "an attractive takeover candidate." (Def.Ex. 118.) Additionally, the evidence presented at trial indicates that the market was aware that Katz was potentially for sale. Less than a month prior to Mark Ginsburg's purchases of Katz stock, a news article in *Electronic Media* quoted analyst Bishop Cheen as stating that "Donaldson, Lufkin & Jenrette may opt to sell its 82 percent stake in Katz." (Def. Ex. 265 at 3.) As the Court noted in its July 8, 2002 [DE 263] Order, "[i]t is plausible that the investments in EZ and Katz Media made by Mark Ginsburg and Jordan Ginsburg were driven not by tips but rather by public knowledge regarding the likelihood of acquisitions in the radio industry."

The evidence at trial demonstrated that it was commonplace for Mark Ginsburg to buy stock. Mark Ginsburg's July 1996 purchase of EZ stock was not an isolated occurrence. In fact, Mark Ginsburg had already purchased large blocks of EZ stock in January and March of that year. (Def. Ex. 564 at 1–2.) Mark Ginsburg testified that the purchases stemmed from his belief that EZ would be a good purchase because passage of the Telecommunications Act would trigger consolidation of the radio industry. *See* Mark Ginsburg Trial Testimony, April 11, 2002 Trial Tr. (afternoon session), at 67–73. The Court also notes that it is unremarkable that Mark Ginsburg purchased a large block of shares of Katz, a company in which he had not invested previously. The evidence demonstrated that Mark Ginsburg frequently traded in large volumes. Indeed, Mark Ginsburg engaged in 253 securities trades from January 1996 and November 1997, including 66 transactions of over $250.000 in value. (Def.Exs.564, 579.) One would expect such an investor to take steps to diversify his portfolio by purchasing securities in companies in which he had not previously held an ownership interest. Mark Ginsburg testified that he often made large investments in companies whose stock he had not owned previously. *See* Mark Ginsburg Trial Testimony, Apr. 11, 2002 Trial Tr. (afternoon session), at 124–25.

The SEC claims that the alleged tipping of Mark Ginsburg regarding the acquisition of EZ occurred in a series of phone calls that occurred from July 14, 1996 through July 29, 1996. The SEC provides evidence of calls between phone numbers registered to Scott Ginsburg, Mark Ginsburg and Betty and Jordan Ginsburg. From July 14, 1996 through July 29, 1996, 15 calls were placed between the three

phone numbers. The phone records indicate that, during the relevant time period, six calls were placed from Scott Ginsburg's number to Betty and Jordan Ginsburg's number, six calls were placed from Scott Ginsburg's number to Mark Ginsburg's number, two calls were placed from Mark Ginsburg's number to Scott Ginsburg's number, and one call was placed from Betty and Jordan Ginsburg's number to Scott Ginsburg's number. (Pl.Ex. 101.)

The SEC's allegations that Scott Ginsburg tipped Mark Ginsburg regarding the acquisition of Katz on June 16, 1996 again stem from telephone records indicating that phone calls occurred between the brothers' residences that evening. Both Scott and Mark Ginsburg deny that any tipping occurred with respect to Katz. *See* Scott Ginsburg Testimony, Apr. 11 Trial Tr. (afternoon session), at 18–22; Mark Ginsburg Testimony, April 11 Trial Tr. (afternoon session), at 100, 124. Phone records indicate a brief phone call from Mark Ginsburg to Scott Ginsburg's office number earlier that day, before Scott Ginsburg met with Olds. Ten phone calls were placed among the three residences from June 15–17, 1997. Mark Ginsburg testified that Scott Ginsburg did not provide him with inside information regarding a potential takeover of EZ. *See* Mark Ginsburg Testimony, April 11 Trial Tr. (afternoon session), at 87, 91.

The phone records are insufficient to compel an inference that Scott Ginsburg conveyed material, non-public information to Mark Ginsburg relating to EZ and Katz. All the phone records prove is that it was common for members of the two households to speak on the phone frequently. To infer the content of the calls based on the fact that the calls were made is pure speculation. The phone records prove nothing about who spoke to whom at a particular time. Any call between Scott Ginsburg's house and Mark Ginsburg's house could have involved Scott Ginsburg, his wife or his children on the one hand, and any of Mark Ginsburg, his wife, or his child on the other. The same is true for calls between the home of Scott Ginsburg and the home of Betty and Jordan Ginsburg. These calls could have involved Scott Ginsburg, his wife or his children on the one hand, and either Betty or Jordan Ginsburg on the other. It is particularly unlikely that Scott Ginsburg placed calls to Jordan Ginsburg, as Scott Ginsburg testified that the two were estranged from each other. *See* Scott Ginsburg Testimony, April 11 Trial Tr., at 518. All the phone records demonstrate is that the Ginsburg family members called each other frequently. Telephone calls between residences of family members are commonplace and are not a sufficient basis from which to infer illegal conduct. The SEC has demonstrated that Scott Ginsburg *could* have disseminated information to Mark Ginsburg, but that Scott Ginsburg *could* have engaged in a practice does not warrant an inference that he *necessarily* engaged in the practice.

Scott and Mark Ginsburg have presented unrebutted testimony that no tipping occurred with respect to Mark Ginsburg's purchases of EZ and Katz securities. This Court will follow Eleventh Circuit precedent that requires it to accept these unrebutted assertions as true. That Scott Ginsburg had the opportunity to communicate inside information to Mark Ginsburg does not warrant an inference that he actually communicated the information. If the record evidence in *Brochu*, for example, demonstrating the implementation of an adverse employment action virtually immediately after Plaintiff engaged in pro-

**1322**

tected conduct, does not constitute circumstantial evidence of misconduct, the Court cannot fathom how the record evidence in the instant case constitutes circumstantial evidence sufficient to warrant a jury verdict for the SEC. The Court finds additional support for its ruling from the fact that the market was aware that EZ and Katz were potential takeover targets and the uncontroverted evidence that Mark Ginsburg was a sophisticated, high volume securities trader.

The SEC has established that Scott Ginsburg *could* have tipped Mark Ginsburg. It has not established that Scott Ginsburg *actually* tipped Mark Ginsburg. In light of the Eleventh Circuit's numerous pronouncements that "could have told" does not equal "did tell," the SEC's circumstantial evidence fails to establish the fact of insider trading "rather than anything else." *Burrell,* 970 F.2d at 788. A jury verdict for Plaintiff SEC and against Defendant Scott Ginsburg therefore stems from speculation rather than inference. The Court hereby overturns the jury's verdict for Plaintiff SEC and against Defendant Scott Ginsburg on the grounds that the SEC has failed to prove by a preponderance of the evidence that Scott Ginsburg tipped his family members in violation of federal securities laws.

## IV. *CONCLUSION*

Upon consideration of the record, the motions and the governing law, for the reasons stated herein, it is hereby

ORDERED AND ADJUDGED that Defendant's Renewed Motion for Judgment as a Matter of Law, filed July 22, 2002 [DE 264] is hereby GRANTED. The final judgment against Scott K. Ginsburg of July 8, 2002 [DE 262] is hereby VACAT-

ED. Final judgment shall be entered by separate order.