Jancie VINSON

v.

**DEPARTMENT OF CORRECTIONS,**
**State of FLORIDA.**

**Case No. 1:08–cv–00181–MP–AK.**

United States District Court,
N.D. Florida,
Gainesville Division.

July 13, 2009.

Marie A. Mattox, Marie A. Mattox PA, Tallahassee, FL, for Jancie Vinson.

Frank Damon Kitchen, Constangy Brooks & Smith LLC, Jacksonville, FL, for Department of Corrections State of Florida.

## JUDGMENT

MAURICE M. PAUL, Senior District Judge.

This action came before the Court with the Honorable Maurice M. Paul presiding, The issues have been tried or heard and a decision has been rendered. Summary Judgment is entered in favor of the Defendant, DEPARTMENT OF CORRECTIONS STATE OF FLORIDA and against Plaintiff, JANCIE VINSON.

## ORDER

This matter is before the Court on Defendant's motion for summary judgment (Docs. 65 and 66), Plaintiff's response in opposition thereto (Doc. 73), and Defendant's reply to Plaintiff's response in opposition thereto (Doc. 83). For the reasons stated below, the Court will grant Defendant's motion for summary judgment.

## I. FACTUAL BACKGROUND [1]

Plaintiff's second amended complaint (Doc. 24) alleges that Defendant, Department of Corrections ("DOC" or "DC"), retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 1981, and the Florida Civil Rights Act ("FCRA"), Chapter 760, Florida Statutes. The alleged retaliation occurred in the course of Plaintiff's employment with Defendant as a Correctional Probation Specialist ("CP Specialist"). Plaintiff has held her current position with Defendant since November 30, 2001, and has worked for Defendant in its Gainesville West Office since March 2006. That office is one of four Community Corrections Offices within Florida's Eight Judicial Circuit. As a CP Specialist, Plaintiff does not supervise any other employees or staff. The Eighth Judicial Circuit is one of seven judicial circuits within Region I Community Corrections.

Community Correction operations in each judicial circuit are overseen by a Circuit Administrator ("CA") who reports to the Regional Director ("RD") and Deputy Regional Director ("DRD") in its assigned region. At all times relevant and material to Plaintiff's present lawsuit, the CA of the Eighth Judicial Circuit has been Shelia Smalls. Between April 7, 2006, and August 1, 2008, John Walkup was the Deputy Circuit Administrator ("DCA"), who is di-

---

1. Unless otherwise noted, the undisputed portions of Defendant's Statement of Undisputed

Material Facts (Doc. 67) form the basis of the Court's findings of fact.

rectly below the CA in the chain of command. Doc. 68–52 at ¶ 3. Between April 2005 and April 2006, Walkup was a Correctional Probation Senior Supervisor ("CPSS") in charge of the Gainesville West Office. *Id.* The position of CPSS is directly below the DCA in the chain of command. On August 1, 2008, Walkup became the CA for the Second Judicial Circuit. *Id.* Plaintiff alleges that Smalls and Walkup unlawfully retaliated against her by denying her requests to be promoted and transferred on June 12, 2006, and July 21, 2006, respectively, which is during the time that Walkup was the DCA under Smalls.

Directly below the position of CPSS in the chain of command is the position of Correctional Probation Supervisor ("CPS"), which is not to be confused with Plaintiff's position of CP Specialist, which is not a supervisory position. Plaintiff's position of CP Specialist, though not a supervisory position, was once on the same pay grade and considered to be a lateral rank as the CPS position. As of 2007, however, the CPS position is ranked above the CP Specialist position in the chain of command. Plaintiff once served as a CPS; however, as discussed below, CA Adam Thomas administratively reassigned her from CPS to CP Specialist on November 30, 2001. Thomas claims to have done this because he determined that Plaintiff was not fit to be a supervisor, which Plaintiff disputes. This reassignment was one of the subjects of a 2002 lawsuit filed by Plaintiff against Defendant, which ended when this Court granted summary judgment in favor of Defendant. Case Number 1:02–cv–000090–MP. It is not, however, a subject of the instant case.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Once a movant for summary judgment successfully discharges his or her burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-movant to establish, *by going beyond the pleadings,* the existence of a genuine issue of material fact. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).

In determining whether a genuinely disputed fact is material, the Court looks to the substantive law applicable to the claimed causes of action and examines the evidence in the light most favorable to the non-movant, drawing all justifiable inferences in his or her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. The purpose of the Court in deciding a summary judgment motion is not to decide issues of material fact, but rather to determine whether such issues exist to be tried. *Fernandez v. Bankers Nat'l Life Ins. Co.,* 906 F.2d 559, 564 (11th Cir.1990). If the non-movant bears the burden of proof at trial, the movant is entitled to summary judgment upon showing that the non-movant cannot prove an essential element of his or her cause of action through the *admissible* evidence in the record. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

 Title VII prohibits retaliation by an employer against an employee or applicant because that person "has opposed . . . an unlawful employment practice . . . or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir.2008). The elements for establishing a claim of retaliation under the FCRA are identical. *See Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1301 (11th Cir.2000). "Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida act was patterned after Title VII." *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir.1998) (citations omitted).

 A plaintiff may establish a prima facie case by either direct or circumstantial evidence. *See Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999). Direct evidence is "evidence, which if believed, proves the existence of fact in issue without inference or presumption. Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997); *see also Masso v. Miami–Dade County*, 465 F.Supp.2d 1260, 1264 (S.D.Fla.2006) ("Under Eleventh Circuit precedent, only the most blatant remarks, whose intent could mean nothing other than to retaliate on the basis of an impermissible factor constitute direct evidence of retaliation.") (internal quotation and citation omitted). "Where the

non movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt*, 120 F.3d at 1189.

 In cases where a plaintiff presents only circumstantial evidence of retaliation, Title VII's burden shifting standard applies. Under that standard, a plaintiff must first establish a prima facie case of retaliation, establishing a presumption of retaliation. The burden then shifts to the defendant to rebut the presumption of retaliation by providing a legitimate, non-discriminatory reason for the adverse employment action, which would then require the plaintiff to show that the employer's proffered reasons for taking adverse action were merely pretextual. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If a plaintiff fails to offer sufficient evidence to establish a genuine issue of material fact as to whether the employer's reasons were pretextual, then summary judgment in favor of the employer is proper. *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir.2004).

In the instant case, Plaintiff argues that she has established a prima facie case of unlawful retaliation through both direct and circumstantial evidence. In order to address the merits of Plaintiff's argument, the Court must first identify the statutorily protected activities and adverse employment actions at issue. If Plaintiff's activities are not statutorily protected, then direct evidence that her employer took adverse employment action against her in retaliation for those activities would not preclude summary judgment. Likewise, if the employment action in question is not an adverse employment action under Title VII, then direct evidence that the employer took the action in retaliation

for Plaintiff's statutorily protected activities would not preclude summary judgment.

## A. Plaintiff's Statutorily Protected Activities

■ Under 42 U.S.C. § 2000e–3(a), there are two types of statutorily protected activities that may form the basis for a retaliation claim. The first is contained in the "participation clause," which provides protection to an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). The participation clause "protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC...." *EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir.2000); *see also Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (instigation of statutory proceedings is a prerequisite to protection under the participation clause).

■ The second type of protected activity is contained in the "opposition clause," which provides protection to an employee who "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). The opposition clause protects activity with occurs prior to the filing of a formal charge with the EEOC, such as filing an internal complaint of discrimination with an employer or informally complaining of discrimination to one's supervisors. *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir.2001) (citing *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)). However, an employee who seeks protection under the opposition clause must demonstrate that the employee opposed an employment practice that the employee subjectively believed to be unlawful under Title VII and that the employee's subjective belief was objectively reasonable in light of the facts and record presented. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir.1999): *Rollins*, 868 F.2d at 400.

■ The objective reasonableness of an employee's activities under the opposition clause depends both on the reasonableness of the employee's belief that the opposed employment action occurred and the reasonableness of the employee's belief that the opposed employment action was unlawful. Therefore, "the relevant [employer] conduct does not include conduct that occurred ... but was unknown to the person claiming protection under the clause," *Clover*, 176 F.3d at 1352, and the employer conduct must only be "close enough [to unlawful conduct] to support an objectively reasonable belief that it is [unlawful]." *Id.* at 1351. The employee's belief that the opposed employment action was unlawful "must be measured against existing substantive law." *Id.* at 1351 (citing *Harper*, 139 F.3d at 1388 n. 2 (failure to charge the employee who opposes an employment practice with substantive knowledge of the law "would eviscerate the objective component of our reasonableness inquiry")).

The parties dispute whether courts, in analyzing the reasonableness of an employee's subjective belief that the opposed employment practice was unlawful, apply the substantive law as it currently exists or apply the substantive law as it existed at the time of the offense. The Court's resolution of this dispute is important, because the parties agree that Plaintiff's opposition to Defendant's allegedly unlawful employment practices took place before the United State Supreme Court's holding in *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), which abrogated the Eleventh Circuit's narrower interpre-

tation of what constitutes "discrimination" in retaliation cases. After *Burlington,* an employee can establish a claim of retaliation under Title VII by showing that the challenged action would have been "materially adverse" to a reasonable employee, meaning that "the employer's action must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington,* 548 U.S. at 57, 126 S.Ct. at 2409. The holding in *Burlington* "strongly suggests that it is for the jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Crawford v. Carroll,* 529 F.3d 961, 974 n. 13 (11th Cir.2008) (citing *Burlington,* 126 S.Ct. at 2417).

 Although the Court can find no post-*Burlington* case applying pre-*Burlington* precedent to determine the reasonableness of an employee's activities under the opposition clause, the Eleventh Circuit has on more than one occasion characterized in more precise language its holding in *Clover,* stating that an employee's "subjective belief is measured against the substantive law at the time of the offense." *Henderson v. Waffle House, Inc.,* 238 Fed. Appx. 499, 501 (11th Cir.2007) (not reported); *accord Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1187 (11th Cir.2001). This view is consistent with the purpose of the reasonableness analysis under the opposition clause, which is to determine not whether the opposed employment action was actually unlawful but, rather, whether at the time of the employee's opposition the employee reasonably believed it to be unlawful. Therefore, in analyzing the reasonableness of Plaintiff's opposition to alleged discrimination and retaliation, the Court will apply the substantive law of the Eleventh Circuit

as it existed at the time the alleged discrimination and retaliation took place.

 Under the law in the Eleventh Circuit as it existed prior to *Burlington,* Title VII's protection against retaliatory discrimination extended to adverse employment actions which fell short of ultimate employment decisions. *See Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998) (holding that the combination of a suspension, the solicitation only of negative statements in the employer's investigation, a death threat, and a refusal to promptly permit an employee to seek medical care met the threshold to survive summary judgment). Although the *Wideman* Court declined to precisely delineate what types of employment actions meet the "threshold level of substantiality" required to constitute adverse employment actions under Title VII, the Eleventh Circuit later described such actions as those that, "in some substantial way, 'alter[ ] the employee's compensation, terms, conditions, or privileges of employment, deprive him or her of employment opportunities, or adversely affect [ ] his or her status as an employee.'" *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir.2008) (quoting *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000)). Importantly, "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Gupta,* 212 F.3d at 587 (internal quotations and citation omitted).

### 1. Protected Activities Alleged by Plaintiff

By her own estimation, Plaintiff has participated in at least five civil lawsuits against Defendant since 1991. Doc. 67 at ¶ 4. In her second amended complaint, however, Plaintiff alleges only the following specific instances of protected activity: (1) she testified against the DOC in 1994

in a "sexual harassment/discrimination" case, styled *Ramsey v. Singletary*; (2) she filed a race and retaliation lawsuit against the DOC in 2002, styled *Vinson v. Moore*; (3) she testified against the DOC on September 9, 2004, in a race and retaliation case, styled *Cave v. Department of Corrections*; and (4) she filed with the DOC on September 16, 2005,[2] an internal complaint of ongoing racial and gender discrimination and retaliation. Doc. 24 at ¶¶ 7, 11, 13, and 14. The Court notes that Plaintiff also made on February 15, 2006, an informal complaint of "inconsistent" treatment by her auditors, but she does not allege in that complaint that the treatment was unlawfully discriminatory or in retaliation for protected activities, and she does not now argue that the February 15, 2006, complaint constitutes a protected activity. *See* Doc. 71–10, Plaintiff's Exhibit 14. Plaintiff's only mention of the February 15, 2006, email is in her statement of disputed material facts, where she cites it as anachronistic evidence that she reasonably believed in 2005 that the auditors were reviewing her cases more harshly. Therefore, the Court does not consider whether the email constituted a protected activity.

Defendant does not dispute that the first three opposition activities alleged in Plaintiff's amended complaint constitute protected activity under the participation clause. Doc. 66 at 6. Defendant argues, however, that Plaintiff's 2005 complaints of discrimination and retaliation, which must be analyzed under the opposition clause, do not qualify as protected activity, because they were not based on an objectively reasonable belief that the DOC was engaging in unlawful employment practices. *Id.*

### 2. Plaintiff's September 16, 2005, Internal Complaint

In the September 16, 2005, internal complaint (Doc. 71–20, Plaintiff's Exhibit 26), Plaintiff alleges continuing discrimination and retaliation against her by two correctional services analysts ("CSA's"), Jack Schenck and William Dotson, and the previous Deputy Circuit Administrator, Susan Bissett–Dotson, who is the wife of William Dotson and whom Plaintiff claims was one of the people about whom Cave complained in his discrimination suit. Doc. 68–4, Plaintiff's Deposition, at 180. Plaintiff claims that the discrimination alleged in her complaint began shortly after and was in retaliation for her September 9, 2004, participation in the *Cave* case. *See id.* at 148–51. "I was having to constantly justify what I was doing and other case auditors were not having to do that." Doc. 71–43, Plaintiff's Affidavit, at ¶ 4.

According to Plaintiff's deposition testimony, the auditors issue an "exception" whenever they discover an oversight in a correctional probation specialist's handling of a case. Doc. 68–4 at 170. Although exceptions can lead to reprimands or other disciplinary action, Plaintiff concedes that they are not themselves a form of disciplinary action. *Id.* at 171. In Plaintiff's case, an exception led to disciplinary action in only one case, when Circuit Administrator Shelia Smalls issued Plaintiff a written reprimand for failing to timely investigate a sex offender's admission in a polygraph examination that he violated a term of his probation by having multiple contacts with his victim. *Id.* Before the reprimand, Smalls issued Plaintiff a predetermination

---

**2.** Plaintiff states in her complaint and in her deposition that she filed her internal complaint on November 2, 2005. In her statement of material facts, however, Plaintiff states that she filed her internal complaint on September 16, 2005. Plaintiff's Exhibit 26 (Doc. 71–20) is a copy of the internal complaint. It is signed and dated September 16, 2005.

letter, which Plaintiff references in her September 16, 2005, complaint.

In the complaint, Plaintiff makes five specific allegations of discrimination and retaliation. First, Plaintiff alleges that CSA's Schenck and Dotson gave Plaintiff less time than her white male co-worker, Alan Katz, to prepare for case reviews by ensuring that Plaintiff's cases were reviewed before those of Katz. Katz was the only other correctional probation specialist working with Plaintiff in the Gainesville Main Office. Second, Plaintiff alleges that, in contrast to Katz and other employees, Plaintiff was not given an opportunity after her case reviews "to address the minor deficiencies [discovered by] the auditors," which would have allowed her to fix those mistakes before being issued an exception. Third, Plaintiff alleges that the auditors cited her more readily than they cited other employees for deficient handling of case files, increasing her workload. Fourth, Plaintiff alleges that she discovered file entries missing after auditors reviewed her files, implying that the auditors wrongfully deleted those entries. Finally, Plaintiff alleges that she received a predetermination letter notifying her of possible disciplinary action for committing a violation that she claims was also committed by Katz, who was not facing disciplinary proceedings despite the auditors' discovery of that violation.

 As discussed below, Plaintiff's opposition to the fourth and fifth alleged adverse employment actions does not constitute protected activity, either because it was not objectively reasonable for Plaintiff to believe that the actions complained of actually occurred or because Plaintiff was aware of legitimate, non-retaliatory reasons for those actions. Therefore, the Court must determine whether Plaintiff's opposition to the first three alleged adverse employment actions constitutes protected activity. For the reasons stated below, the Court finds that Plaintiff reasonably believed that (1) the auditors had always conducted her audits before Katz's audits; (2) they had on several occasions allowed Plaintiff's co-workers to correct minor mistakes before issuing them exceptions, a courtesy Plaintiff did not enjoy; and (3) they had on several occasions failed to cite her co-workers for minor oversights similar to those for which they cited Plaintiff.

In light of the temporal proximity of the disparate auditing to Plaintiff's September 9, 2004, testimony in *Cave* and the involvement in that case of CSA Dotson's wife, it was reasonable for Plaintiff to believe that the auditors intentionally retaliated against her for a protected activity about which they had knowledge. However, Plaintiff has failed to present sufficient evidence to show that she reasonably believed herself to be the target of more than a few minor, isolated incidents of disparate auditing. More importantly, even if it was reasonable for Plaintiff to believe the disparate treatment was as pervasive as alleged, it was not reasonable for her to believe that such treatment constituted an unlawful employment practice. Therefore, Plaintiff's September 16, 2005, internal complaint and her subsequent informal complaints do not constitute protected activities.

Taken together, the first three allegations in the internal complaint allege disparate treatment by CSA's Schenck and Dotson in the course of their auditing of Plaintiff's case files. Plaintiff does not cite in her response memorandum or her statement of disputed material facts any evidence to support the reasonableness of her belief that the auditors were treating her differently. As noted by Defendant in its reply memorandum, the evidence Plaintiff does cite relates to events which occurred long after the filing of her complaint and

therefore could not have informed her belief that she was being treated differently at the time she complained. Also, the only evidence Plaintiff cites in her affidavit relates to instances where other employees were in fact cited by the auditors but were not later issued written reprimands. Doc. 71–43 at ¶ 3. That evidence is not relevant to her allegation that CSA's Schenck and Dotson were auditing her more harshly. In fact, the only supporting evidence the Court has been able to locate is Plaintiff's deposition testimony regarding all three of the alleged wrongs.

As to Plaintiffs main allegation, Plaintiff testified that, at unspecified point, she accessed the case notes of other employees and conducted her own random audit, discovering oversights the auditors did not cite. Doc. 68–4 at 162–63. Although it is not entirely clear, the Court for purposes of summary judgment infers from Plaintiff's testimony that these random audits are alleged to have taken place before Plaintiff's 2005 complaints of discrimination.[3] Unfortunately, Plaintiff provides few details about what she discovered during these audits. When asked what evidence she has to prove that she was treated differently, she points to documentation she says she provided to the Inspector General in support of her September 16, 2005, internal complaint. *Id.* at 163. However, Plaintiff has not provided these documents to the Court.

Viewing the evidence in the light most favorable to Plaintiff, the Court cannot conclude that it was reasonable for Plaintiff to believe that the auditors were constantly singling her out for harsher treatment in retaliation for her protected activities. At most, Plaintiff can claim only a reasonable belief that the auditors had, on several occasions, failed to cite her co-workers for admittedly minor oversights similar to those for which they cited Plaintiff. Even under the more expansive standard in *Burlington,* such increased scrutiny of Plaintiff's cases (or decreased scrutiny of her co-workers' cases), whether or not motivated by a retaliatory animus, cannot reasonably be characterized as materially adverse.

Plaintiff also alleges in her deposition that she personally witnessed the auditors give other employees an opportunity to correct minor mistakes before being issued an exception. Doc. 68–5 at 185–86. The allegation that the auditors always reviewed Plaintiff's cases first is also based on personal observations alleged in her deposition. Accepting Plaintiff's testimony as true, the Court finds that Plaintiff reasonably believed the auditors were treating her in the manner alleged. Again, even under the more expansive standard in *Burlington,* it was not reasonable for Plaintiff to believe that these two alleged actions were unlawful. Under the case review policy discussed in Plaintiff's deposition, the auditors are required to give at least one week's notice of their intention to come to an office to examine case files. Doc. at 167–68. Plaintiff does not contend that CSA's Schenck and Dotson ever failed to comply with that policy. *Id.* Although Plaintiff claims that Katz was given extra

---

**3.** Plaintiff could also be referring to a later review she conducted, which formed the basis of her February 15, 2006, email. *See* Doc. 71–10, Plaintiff's Exhibit 14. In that email, Plaintiff cites one example of an exception she received that she believed to be unfounded. She also cites three alleged mistakes made by Katz that the auditors did not cite. Plaintiff's exhibit includes a reply from Susan Bissett-Dotson, who apparently reviewed each of Plaintiff's allegations and provided explanations for why each of the Plaintiff's complaints were without merit. Plaintiff has not disputed those explanations, which is perhaps why she does not now argue that the 2006 email constituted reasonable opposition to an unlawful employment practice.

time to prepare for case reviews by virtue of the fact that the auditors always started her case reviews first, Plaintiff concedes that she was given sufficient time to prepare for the audits. *Id.* at 169. It is difficult, then, to characterize this employment action as adverse, let alone materially adverse. As for her not being given the opportunity to correct minor mistakes before being issued an exception, Plaintiff does not contend that having such an opportunity would have reduced her workload, only that it would have allowed her to avoid being issued an exception. Moreover, Plaintiff does not contend that other employees were ever able to avoid being issued exceptions for mistakes major enough to lead to disciplinary action.

When considered collectively, the three types of alleged disparate treatment by the auditors do not come close to the string of significant and material abuses discussed in *Wideman.* Although Plaintiff need only show that the auditors' behavior was "close enough [to unlawful conduct] to support an objectively reasonable belief that it is [unlawful]," *Clover,* 176 F.3d at 1351, Plaintiff has failed to meet even this burden. Other than the eventual issuance of a written reprimand, which is addressed below, Plaintiff points to no actual or threatened disciplinary action that resulted from the auditors' behavior. *See* Doc. 68–4 at 173. In fact, Plaintiff does not allege that the auditors' behavior ever led to additional work that Plaintiff was not already required to do under the terms of her employment, and she provides no evidence that these exceptions ever limited her opportunities for advancement. Instead, Plaintiff's main complaint is that other employees got away with apparently minor oversights for which she was rightly issued exceptions. *See id.* at 173–74 ("A lot of little incidents that—things that they should have cited them for that is on the case review policy and procedures of reviewing, they didn't cite them for it. It

was simple things, different things that they cited me for."). It was not reasonable for Plaintiff to believe such behavior was unlawful, even when combined with the other two alleged actions, which were also de minimis.

Similarly, the fourth and fifth allegations in Plaintiff's September 16, 2005, complaint were not objectively reasonable in light of the facts and record presented and, accordingly, do not constitute protected activities. Plaintiff concedes in her deposition testimony that she has no evidence that the auditors ever deleted any information from her case files, noting that any employee can pull up another employee's electronic case files and that, with the exception of case notes that cannot be changed by anyone other than the author, file entries can be anonymously deleted by any of those employees. Doc. 68–5, Plaintiff's Deposition, at 188–91. Therefore, Plaintiff has not presented sufficient evidence to show that her opposition to this alleged wrong was objectively reasonable.

Similarly, Plaintiff has provided zero evidence to substantiate her September 16, 2005, claim that Katz was not being disciplined for committing a violation similar to the one for which she was facing possible disciplinary action. Indeed, she appears to have abandoned that specific allegation. *See id.* at 219. Plaintiff does allege that another employee, Judith Phelps–Whitman, did not face disciplinary action despite being cited for failing to timely follow up on a similar report of a violation of probation. *Id.* at 212–13 and 219. However, Plaintiff states in her affidavit that she discovered this fact on December 18, 2005, long after she filed her September 16, 2005, internal complaint. Doc. 71–43 at ¶ 3. Therefore, that discovery could not have formed the basis for her belief that the issuance of the predetermination letter

was discriminatory or in retaliation for protected activity.

In any event, Plaintiff was aware at the time of her complaint that legitimate, non-discriminatory reasons existed for the issuance of the predetermination letter. On August 8, 2005, Smalls notified Plaintiff of disciplinary charges being brought against Plaintiff for failure to timely investigate a sex offender's admitted violation of probation. Doc. 68–9, Exhibit 14. According to the allegations, an April 22, 2005, polygraph examination of the sex offender, Bobby Jackson, revealed that he had been in contact with his victim on multiple occasions since his release from prison. *Id.* A report of the examination, which included these findings, was faxed to Plaintiff on April 27, 2005, but Plaintiff failed to investigate whether the contacts had occurred until after a review of Mr. Jackson's case was completed, resulting in his arrest on June 13, 2005. *Id.* Plaintiff asserted at the time of the predetermination letter that, although the faxed report was in her case file, she had not seen it and did not remember receiving it.

On September 12, 2005, a predetermination conference was held to consider the allegations. Doc. 68–9, Exhibit 17. On October 18, 2005, Smalls notified Plaintiff that, after consideration of Plaintiff's response to the allegations, the DOC had decided to suspend Plaintiff for five workdays, effective October 25, 2005. *Id.* In arriving at this decision, Smalls stated that she also considered Plaintiff's employment record, specifically the following:

[Y]ou received a five (5) day suspension on May 1, 2003 for conduct unbecoming a public employee and threatening of a departmental employee while at work; a four day suspension in September 15, 1995 for insubordination and failure to follow oral and/or written instructions; insubordination, and conduct unbecoming; and an Oral Reprimand on October 11, 1993 for failure to follow oral and/or written instructions.

*Id.*

The suspension was subsequently rescinded. In lieu of the suspension, Smalls issued on November 28, 2005, a written reprimand of Plaintiff. Doc. 68–9, Exhibit 19. Both Plaintiff and Smalls signed the reprimand on November 30, 2005. *Id.* On December 2, 2005, Plaintiff filed a grievance seeking recision of the written reprimand, claiming that it was excessive and unjust. Doc. 68–9, Exhibit 20. According to a letter dated January 20, 2006, from Ralph Kiessig, Director of Human Resources, a management representative denied the grievance and its requested relief in a response dated December 15, 2005. Doc. 68–9, Exhibit 21. After a January 12, 2006, meeting with a union representative arguing on behalf of Plaintiff, Kiessig determined that the grievance and its requested relief should be denied, finding that, even if Plaintiff never saw the faxed report, Plaintiff should have known that the polygraph report was forthcoming and should have investigated the findings of the report in a more timely manner. *Id.*

Plaintiff concedes that, to her knowledge, she is the only person who has been cited for failing to timely investigate a sex offender's admitted contact of his or her victim. Doc. 68–4 at 172. Although Plaintiff continues to claim that she does not remember receiving the faxed polygraph report. Plaintiff concedes that an officer's failure to timely follow up on such a report would be grounds for the issuance of an exception by an auditor. Doc. 68–5 at 204–05. Also, Plaintiff does not allege that her employer knew she never received the report, *id.* at 218–19, and she has offered no argument in rebuttal of Kiessig's determination that, even if she did not receive the report, she should have known that it was forthcoming. Therefore, Plaintiff's

September 16, 2005, complaint regarding the issuance of a predetermination letter for this incident was not objectively reasonable, because Plaintiff was aware of legitimate, non-discriminatory reasons for the issuance of the letter.

In summary, Plaintiff's 2005 complaints of discrimination and retaliation do not constitute protected activity. While it is not necessary for Plaintiff to prove the underlying claims of discrimination and retaliation, Plaintiff must be able to show that it was reasonable for her to believe that she was opposing an unlawful employment practice. Because Plaintiff cannot satisfy this burden, the only remaining protected activities that can form the basis for Plaintiff's instant retaliation claim are: (1) her 1994 participation in a sexual harassment and discrimination case, styled *Ramsey v. Singletary;* (2) her 2002 filing of a race and retaliation lawsuit against the DOC, styled *Vinson v. Moore;* and (3) her September 9, 2004, participation in a race and retaliation case against the DOC, styled *Cave v. Department of Corrections.*

## B. Defendant's Adverse Employment Actions Against Plaintiff

Although Plaintiff's second amended complaint (Doc. 24) contains only one count of retaliation, Plaintiff alleges that she engaged in multiple protected activities over a period of more than ten years and, as a result, suffered multiple adverse employment actions. On January 29, 2009, the Court entered an order (Doc. 49) partially dismissing Plaintiff's complaint, holding that, under one or both of the applicable statutes, several of the alleged adverse employment actions—including some of the actions discussed above—occurred outside of the statute of limitations and that, therefore, Plaintiff's claim was time-barred with respect to those allegations. Subsequently, Plaintiff filed her statement of disputed material facts (Doc. 72), in which she states in a footnote that she has abandoned her claim as it relates to alleged adverse employment actions covered under the FCRA but time-barred under Title VII. As an initial matter, then, the Court hereby accepts as true paragraphs 20–42 of Defendant's statement of undisputed material facts, to which Plaintiff did not respond, and grants summary judgment in favor of Defendant with respect to the abandoned claims.

Consequently, the only employment actions at issue are as follows: (1) the June 12, 2006, denial of a promotion to CPSS Position No. 07756; (2) the July 21, 2006, denial of a lateral transfer to CPS Position No. 8033 in Starke; and (3) the August 2006 placement of Plaintiff on a GPS on-call monitoring schedule. Defendant concedes that the denials of the promotion and transfer are adverse employment actions within the meaning of Title VII but argues that the placement of Plaintiff on a GPS on-call monitoring schedule is not.

The Court agrees with Defendant. As Defendant notes in its reply memorandum, Plaintiff has conceded that her placement on the GPS on-call monitoring schedule "is not in and of itself an adverse [employment] action." Doc. 83 at 3, n. 3 (quoting Doc. 73 at 10). Plaintiff now contends, however, that Walkup's initial denial of her request to be excused from on-call duty because of her duties as a single parent with two small children constitutes an adverse employment action. Even if the Court were to allow Plaintiff to recast her claim, it would not survive summary judgment.

Plaintiff and all other CP Specialists living in Gainesville in the summer of 2006 were placed on the GPS on-call schedule. While on call, CP Specialists were required to monitor beepers that would sound if a sex offender wearing a GPS tracking device strayed beyond a boundary designated as a term of his or her probation.

Plaintiff was initially scheduled to be on call the week of August 21–27, 2006. A few days before Plaintiff's shift, Walkup denied Plaintiff's request to be removed from the schedule. Plaintiff was able to appeal Walkup's denial to Deputy Regional Director ("DRD") Barry Groves, which she did not do until the same day she was scheduled to begin work. Upon short notice, Groves informed Plaintiff that he would permanently excuse her from on-call duty but that she would have to find someone to cover her shift for that week, which she did. Doc. 68–29, Groves Affidavit, at ¶ 25. As a result, Plaintiff never worked the GPS on-call schedule. No reasonable employee would consider such treatment to be materially adverse. Even if Plaintiff had not been excused, there would have been no change—material or otherwise—to the terms and conditions of Plaintiff's employment. Moreover, Plaintiff was aware of legitimate, non-retaliatory reasons for assigning all CP Specialists who resided in Gainesville to the on-call schedule.

Therefore, the only adverse employment actions that can form the basis for Plaintiff's retaliation claim are: (1) the June 12, 2006, denial of a promotion to CPSS Position No. 07756; and (2) the July 21, 2006, denial of a lateral transfer to CPS Position No. 8033 in Starke. Plaintiff identifies two individuals who allegedly had knowledge of Plaintiff's protected activities and retaliated against her for those activities: Circuit Administrator Shelia Smalls and Deputy Circuit Administrator John Walkup.

### 1. The Denial of Plaintiff's Requested Promotion to CPSS Position No. 07756

The undisputed material facts regarding the denial of Plaintiff's promotion to CPSS Position No. 07756 are as follows.[4] In

April of 2006, Walkup was promoted to DCA of the Eighth Judicial Circuit, creating a vacancy in the Gainesville West Office for CPSS Position No. 07985. After the vacancy was announced, Plaintiff and four other people applied for the position. The other four applicants were CPS Gloria Burgman, CPS Melissa Hinson, CPS Richard Dykes, and CPS Deborah Harden. Smalls eventually awarded the promotion to Burgman. Although Plaintiff alleges in her second amended complaint that the denial of this promotion was in retaliation for her protected activities, Plaintiff has now abandoned that claim.

Pursuant to DOC Promotional Procedures Policy No. 208.005, Personnel Services Specialist Rhonda Douglass completed a promotional score sheet for each applicant, listing the qualified applicants' points in the areas of education, direct work experience, department in-grade experience, and training. Neither Smalls nor Walkup had any role in these point calculations. The only role Smalls and Walkup played in the promotional process was conducting and scoring oral interviews of the applicants as two members of a three-member selection review board. The third member of the board was the CA of the Third Judicial Circuit, Charles Davidson. Doc. 68–39, Smalls Affidavit, at ¶ 28. Douglass then added the oral interview scores to the applicants' total points on the promotional score sheet.

The oral interviews took place on May 3, 2006. *Id.* The board scored Plaintiff's oral interview five points higher than Burgman's oral interview, but Burgman's total promotional score, as prepared by Douglass, was one point higher than Plaintiff's. Doc. 68–41, Smalls Affidavit, Tab 9. DOC policy permitted Smalls to fill CPSS Position No. 07985 with her choice of any of

---

4. Unless otherwise noted, the undisputed portions of Defendant's Statement of Undisputed

Material Facts (Doc. 67) form the basis of the Court's findings of fact.

the top three highest scoring applicants. Both Smalls and Walkup claim to have preferred Burgman because she possessed important leadership qualities Plaintiff lacked. Although he did not participate in the selection process, Regional Director Tony Harper agreed that Burgman was the most qualified applicant and therefore approved the selection. Plaintiff never discussed with Smalls or Walkup their reasons for selecting Burgman over Plaintiff. With regard to Plaintiffs now-abandoned claim that Smalls' selection of Burgman over Plaintiff constituted unlawful retaliation, the Court has granted summary judgment in favor of Defendant.

In May of 2006, CPSS John Cynkar retired, creating a vacancy in the Gainesville Main Office for CPSS Position No. 07756. Smalls chose to fill this position through a competitive application process, rather than fill the position with one of the unsuccessful applicants for CPSS Position No. 07985. As Plaintiff was the only person to apply for both positions, the latter course would have meant granting Plaintiff the promotion without a competitive selection process. Ultimately, the only two applicants for this position were Plaintiff and CPS Daphne Teel, who Smalls eventually chose to fill the position. Once again, other than scoring the oral interviews, neither Smalls nor Walkup played any role in the calculation of points on the promotional score sheet. The third member of the selection review board was Patrice Bryant, who did not participate in the final selection decision. Doc. 72 at ¶ 16; Doc. 71–49, Bryant Deposition, at 7–8. Bryant's involvement consisted solely of scoring the applicants' interviews and providing her scores to Smalls. Doc. 71–49 at 8.

There are five questions listed on the oral interview questionnaire, all of which appear to test an applicant's substantive knowledge of law and policy: (1) "The ASH 0 OTS 22 job provides the requestor with what information?" (2) "Please list the criteria for the Jessica Lunsford Act." (3) "Name 5 crimes which are considered Serious Offenses and ... the responsibilities of the Supervisor when a Serious Offense occurs." (4) "A warrantless arrest refers to the arrest of an offender without a warrant. What are the criteria for a warrantless arrest and when is the violation report due?" (5) "List 5 qualifying events[ ] which require that an Incident Report (DC3–225) be completed." Doc. 71–2, Teel's Oral Interview Score Sheets; Doc. 71–4, Plaintiff's Oral Interview Score Sheets. The members of the selection review board completed a score sheet for each applicant, assigning between zero and three points for each answer. *Id.* Although the interviewers' score sheets provide suggested answers to each question, the allocation of points appears to have been subjective. According to the score sheets provided by Plaintiff, Walkup awarded 11 points to Plaintiff for her oral interview but only 10 points to Teel, while Smalls awarded 10 points to both Plaintiff and Teel. *Id.* In contrast to Smalls and Walkup, Bryant awarded Teel only six points but awarded Plaintiff 10 points. *Id.*

When the oral interview scores were added to the applicants' scores for education, direct work experience, department in-grade experience, and training, Plaintiff outscored Teel by a score of 82 to 71. Once again, Smalls had the discretion to choose either candidate. On June 16, 2006, Smalls chose Teel to fill the position. Before Smalls made her decisions, Smalls sought Walkup's advice. Doc. 68–52, Walkup Affidavit, at ¶ 35. Neither Smalls nor Walkup claim to have preferred Teel based on her performance in the oral interview or her promotional score. Instead, both Smalls and Walkup claim to have preferred Teel because she possessed leadership qualities and interpersonal skills Plaintiff lacked. Plaintiff disputes

that this was the basis for their preference. Harper states in his affidavit that, as with the selection of Burgman for CPSS Position No. 07985, he agreed with Smalls and Walkup that Teel was the best choice to fill the vacancy for CPSS Position No. 07756 and therefore approved the selection. Doc. 68–32, Harper Affidavit, at ¶ 25. Plaintiff does not claim that Harper's approval of the selection was in retaliation for Plaintiff's protected activities.

### 2. The Denial of Plaintiff's Requested Lateral Transfer

The undisputed material facts regarding the denial of Plaintiff's requested lateral transfer to the CPS position in the Starke Office are as follows.[5] Before the selection of Teel for CPSS Position No. 07756, Plaintiff realized that, if Teel were promoted, there would be a CPS vacancy in the Starke Office. In an effort to hedge her bets, Plaintiff submitted on May 24, 2006, a Reassignment Request Form to the Region II Personnel Office. Although she was not aware of any other vacancies, Plaintiff indicated an interest in being reassigned to a CPS position in one of the two Gainesville offices. The CPS position in the Starke Office, CPS Position No. 8033, became vacant on June 16, 2006, when Smalls promoted Teel to CPSS Position No. 07756.

On June 12 and 13, 2006, Plaintiff sent two emails to Douglass, both of which carried a subject line reading "Lateral Reassignment Request for Alachua County Only." Plaintiff stated in her June 12, 2006, email that she was no longer interested in any Alachua County positions, just the Stake CPS position. In her June 13, 2006, email, however, Plaintiff advised Douglass to disregard her previous email, noting that she was still interested in positions in Alachua County. Douglass interpreted

Plaintiff's June 13, 2006, email as a directive to disregard the portion of her June 12, 2006, email expressing interest in the Starke Office position. Therefore, when Smalls sent Douglass an email on June 16, 2006. asking Douglass to forward to her any pending requests for transfer to the Starke Office, Douglass did not inform Smalls of Plaintiff's interest in the Starke position. As a result, Douglass eventually advertised the vacant position as a promotional opportunity. Doc. 68–24, Douglass Affidavit, at ¶ 30.

Despite Douglass' confusion, it appears Smalls was aware of Plaintiff's interest in the position before Douglass advertised the position, in her affidavit, Smalls states, "Because I felt that Plaintiff lacked the necessary leadership qualities and interpersonal skills required to be the supervisor of the Starke Office, 1 requested that the position be advertised...." Doc. 68–39 at ¶ 34. A competitive application process ensued. On July 21, 2006, Smalls promoted CPSO Randall DeShong to the vacant CPS position in Starke. Again, Smalls states that she considered, among other things, Plaintiff's 2005 complaints of discrimination as evidence that Plaintiff lacked the necessary interpersonal skills to fill the position. *Id.* at 143.

The parties dispute whether Walkup was involved in the decision to deny Plaintiff's requested transfer. However, Plaintiff does not specify how Walkup was allegedly involved in the decision and cites no evidence to rebut Defendant's assertion that, "[a]lthough Smalls discussed her decision with Walkup, Walkup did not participate in that decision." Doc. 67 at ¶ 36. In support of this statement of fact, Defendant cites Walkup's affidavit, in which he states that he was not directly involved in the decision but agreed with Smalls that

---

5. Unless otherwise noted, the undisputed portions of Defendant's Statement of Undisputed Material Facts (Doc. 67) form the basis of the Court's findings of fact.

Plaintiff lacked the necessary leadership skills required to be the supervisor of the Starke Office. *See* Doc. 68–52, Walkup Affidavit, at ¶ 36. In her statement of disputed material facts, Plaintiff cites Walkup's deposition testimony to refute this contention. Doc. 71 at ¶ 26 (citing Doc. 72–47, Walkup Deposition, at 66). However, the deposition excerpts cited by Plaintiff do not even discuss Plaintiff's requested transfer, and Plaintiff has provided no other evidence in this regard. It appears, therefore, that Walkup's involvement in the transfer decision was negligible and that, as with the promotion, it was Smalls who made the decision to deny Plaintiff's requested transfer.

## C. Direct Evidence Analysis

■ In the instant case, Plaintiff argues that Smalls has made an admission in her affidavit constituting direct evidence of retaliation. In her affidavit, Smalls states that "Plaintiff was constantly quarrelling (sic) with ... Bill Dotson and Jack Schenck about their review of her case offender files." Doc. 68–31, Smalls Affidavit, at ¶ 38. According to Smalls, this constant quarreling was evidence that Plaintiff had "poor interpersonal skills." *Id.* "Although Plaintiff was constantly complaining that CSA's Dotson and Schenck were reviewing her cases more harshly than her co-workers," Smalls states, "I could find no evidence that this was occurring.... However, because of Plaintiff's constant complaints about CSA's Dotson and Schenck, the DC ultimately assigned the task of performing Plaintiff's case reviews to Correctional Services Consultant ('CSC') Patricia Lightsey, in April of 2006." *Id.* at ¶ 39. Smalls states that she "certainly considered [Plaintiff's] inability to work professionally with CSA's Dotson and Schenck when evaluating whether to either promote or reassign her to a supervisor position within this Circuit." *Id.* at ¶ 43.

■ Plaintiff characterizes these statements as establishing that "Smalls admitted that she used Vinson's complaints about her cases being critiqued more harshly as the reason for rejecting Vinson for both the [promotion] and [transfer]." Doc. 73 at 3. As discussed above, however, Plaintiff's complaints about her treatment by the auditors do not constitute protected activities. Therefore, any adverse employment action motivated by those complaints would not constitute unlawful retaliation under Title VII. Even if the Court were to apply the more permissive standard in *Burlington* to assess the reasonableness of Plaintiff's belief that the auditors' behavior was unlawful, many of Plaintiff's complaints would, as discussed above, still be unreasonable. Because Smalls' statements may be interpreted as referring only to Plaintiff's unreasonable complaints of discrimination, they cannot be considered direct evidence of a retaliatory motive. Indeed, it is not unlawful for an employer to consider an employee's constant, unreasonable complaints of discrimination when determining whether to grant an employee a promotion or other job assignment that requires the exercise of reasoned judgment. *Cf. Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir.1999) (direct evidence of retaliation existed where employer stated that he refused to recommend plaintiff for advanced training because plaintiff exhibited a bad attitude by filing a discrimination claim, which was a protected activity).

## D. Circumstantial Evidence Analysis

In its motion for summary judgment, Defendant argues that Plaintiff cannot establish a prima facie case of retaliation, because Plaintiff cannot prove a causal connection between a protected activity and an adverse employment action. Defendant also argues that, even if Plaintiff can establish a prima facie claim, Defendant had legitimate, non-retaliatory reasons for its actions. For the reasons stat-

ed below, the Court agrees with Defendant on both counts.

### 1. Plaintiff's Failure to Establish a Prima Facie Case

 In order for Plaintiff to prevail at trial, she must be able to prove, through the admissible evidence in the record, that there is a causal connection between her protected activities and an adverse employment action. To establish a causal connection, a plaintiff must show that the protected activity and adverse employment action "are not completely unrelated." *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). This requires the plaintiff to "at a minimum, generally establish that the defendant was actually aware of the protected [activity] at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir.1997). In the absence of additional evidence, a plaintiff may prove causation by showing a close temporal proximity between a protected activity and an adverse employment action. However, "[i]n this Circuit, it has repeatedly been held that a lapse of three or four months between the protected activity and an adverse employment action will not establish the requisite causal connection, in the absence of any other evidence of causation." *Moore v. Hillsborough County Bd. of County Com'rs,* 544 F.Supp.2d 1291, 1309 (M.D.Fla.2008) (citing *Higdon,* 393 F.3d at 1221): *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

As discussed above, the only remaining protected activities at issue are: (1) Plaintiff's 1994 participation in *Ramsey;* (2) Plaintiff's 2002 lawsuit against Defendant; and (3) Plaintiff's September 9, 2004, participation in *Cave.* The only remaining adverse employment actions at issue are: (1)

the June 12, 2006, denial of Plaintiff's requested promotion to CPSS Position No. 07756; and (2) the July 21, 2006, denial of Plaintiff's requested lateral transfer to CPS Position No. 8033. In order to establish a prima facie case, Plaintiff must therefore be able to prove a causal connection between these protected activities and adverse employment actions.

 Plaintiff claims that both Smalls and Walkup unlawfully retaliated against her by denying her requested promotion and transfer. As discussed above, however, Walkup's involvement in these employment actions was limited to scoring Plaintiff's oral interview for the promotion and making a recommendation to Smalls for both the promotion and transfer. The decision-maker in both instances was Smalls. To the extent Walkup influenced Smalls' decisions, the Court considers evidence of Walkup's motivation to be relevant. *See Ferrell v. Masland Carpets,* 97 F.Supp.2d 1114, 1126 (S.D.Ala.2000) ("[A]n employer may be held liable for employment discrimination if the actions of a neutral decision maker are somehow influenced by the prejudice of a non-decision maker."); *see also Pennington v. City of Huntsville,* 261 F.3d 1262, 1270 (11th Cir.2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free from the taint of a biased subordinate employee.").

There is sufficient evidence to prove that both Smalls and Walkup had knowledge of Plaintiff's protected activities at the time they are alleged to have retaliated against Plaintiff. However, because the adverse employment actions at issue occurred nearly two years after Plaintiff's protected activities, Plaintiff cannot prove a causal connection based on temporal proximity alone.[6] Thus, Plaintiff must be able to

---

**6.** Smalls states in her affidavit that she did not Seam of Plaintiff's 2004 testimony in *Cave*

until Plaintiff filed her September 16, 2005, internal complaint, which Smalls erroneously

present some other evidence of a causal connection in order to survive summary judgment.

Because Plaintiff's arguments are largely based on the presupposition that her 2005 complaints of disparate treatment by the auditors constitute protected activities, Plaintiff points to little evidence in her memorandum to establish a causal connection between the adverse employment actions at issue and her prior protected activities. The bulk of Plaintiff's case relies instead on Smalls and Walkup's admissions that Plaintiff's 2005 complaints of unfair treatment by the auditors influenced their opinions of Plaintiff's qualifications. The only other evidence Plaintiff cites relates to Plaintiff's claim that Defendant's proffered reasons for its actions are false, from which Plaintiff argues the Court can infer that Defendant's true motivation was a desire to retaliate against Plaintiff for her protected activities. As discussed below, Plaintiff has shown neither that Defendant's proffered reasons are false nor that it was motivated by a retaliatory animus. Therefore, the Court finds that Plaintiff has failed to establish a prima facie case of retaliation.

## 2. Defendant's Legitimate, Non–Retaliatory Reasons

■ Even if Plaintiff's 2005 complaints of discrimination constitute protected activities, and even if Plaintiff has established a prima facie case of retaliation for those activities, Plaintiff has failed to show that Defendant's legitimate, non-retaliatory reasons for its actions are pretextual. Defendant's burden here "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S.

133, 142, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). In other words, Defendant need only present sufficient evidence for a finder of fact to conclude that its proffered reasons motivated its decision.

■ Once a defendant has satisfied this burden, a plaintiff may survive summary judgment "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). "[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason," so long as "the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997). In the Eleventh Circuit, "an employer may refuse to hire an employee for good reasons, bad reasons, reasons based on erroneous facts, or for no reason at all, as long as its actions are not based on discriminatory purposes." *Lewis–Webb v. Qualico Steel Co. Inc.,* 929 F.Supp. 385, 391 (M.D.Ala.1996) (citing *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984)),

■ In this case, Defendant asserts in its motion for summary judgment that

Smalls and Walkup concluded that Plaintiff was not suited for a supervisory position based upon her: (1) exercise of poor judgment during Hurricane Frances; (2) complaints and challenges to a decision to move all CP Specialists to a newly created Sex Offender Unit; (3) complaints about assisting with caseload reassignments occasioned by the health

states Plaintiff filed on November 2, 2005. Doc. 68–39 at § 11. The temporal proximity between Smalls' becoming aware of Plaintiff's protected activity and Smalls' denial of Plaintiff's requested promotion and transfer is still not sufficient to prove causation without more evidence.

issue of a co-worker; (4) constant quarrelling (sic) with CSA's assigned to review her offender files; and (5) reckless and defiant behavior in directing polygraph examiners to stop sending her court-ordered polygraph examination reports on offenders she was monitoring. Doc. 66 at 17.

As for the first incident cited above, Smalls states the following in her affidavit:

On September 5 and 6, 2004, Hurricane Frances, a major Category 3 hurricane, hit Florida. Although Plaintiff had been issued a cellular telephone by the DC for such emergencies, her supervisor, CPS Michael Hinson, was unable to reach Plaintiff for several days both during and after the hurricane on either her home phone or on the cellular phone provided by the DC . . . . [W]hen Hinson tried to leave a voicemail message on her home telephone, he was unable to do so because the voicemail box was full.

CPS Hinson was finally able to get in touch with Plaintiff on September 8 or 9, 2004. At that time, Plaintiff acknowledged that her voicemail box on her home telephone needed to be cleared out. She also advised that she had been unable to charge her cellular phone because of a loss in power . . . . Plaintiff should have been aware of the need to charge her telephone before the hurricane made landfall. . . . Plaintiff was aware of her of her obligation to maintain contact with both her supervisor and her offenders during this period of time. . . . Although 1 could not establish that Plaintiffs actions warranted discipline, I wondered whether Plaintiff had deliberately sought to avoid her duties . . . during this emergency. At a minimum, Plaintiff exercised extremely poor judgment in a time of crisis.

Doc. 68–39 at ¶¶ 36–37.

Attached to Smalls' affidavit is a September 15, 2004, email from Hinson to Smalls. Doc. 68–41, Tab 30. The email memorializes a conversation Hinson and Smalls had on that day about the inability to reach Plaintiff during the hurricane. In it, Hinson also informs Smalls that he discussed the matter with Plaintiff, who agreed to clear her home answering machine messages and to check her cell phone messages in the future.

In her affidavit, Plaintiff disputes that Hinson ever spoke to her about the Hurricane Frances matter and claims that she "never received any messages nor unanswered calls from either Ms. Smalls nor Mr. Hinson." Doc. 71–43 at ¶ 5. She confirms that her power was out during the hurricane but argues that, if she had done anything wrong, she would have been disciplined. *Id.* Plaintiff does not dispute that she was required to keep her cell phone on, but she claims that "employees who are told to keep the telephones on[ ] are not required to remain available for work or remain within receiving range of the communication device." *Id.* at ¶ 6. However, the fact that Hinson reported to Smalls that he was unable to contact Plaintiff during the hurricane, as documented by Hinson's September 15, 2004, email, is uncontroverted, and it was reasonable for Smalls to conclude, based on what Hinson told her, that Plaintiff had exercised poor judgment.

As for the second non-retaliatory reason offered by Defendant, it is undisputed that Plaintiff was the only employee to complaint about Smalls' decision to relocate all CP Specialists to a dedicated Sex Offender Unit in the Gainesville West Office. Smalls states in her affidavit that she decided in early 2005 to move all CP Specialists (i.e., officers who primarily handle sex offender caseloads) to one office in order to increase efficiency, provide in-house support for the officers, and improve communication with law enforcement and

judges. Doc. 68–39 at ¶¶ 44–45. Because most of the CP Specialists were located in the Gainesville West Office, Smalls decided to move Plaintiff and Katz from the Gainesville Main Office to the Gainesville West Office. On February 20, 2006, Smalls sent an email (Doc. 68–41, Tab 12) to all six CP Specialists, informing them of the planned consolidation. She then met with Plaintiff and Katz on March 1, 2006, to discuss the move.

On that same day, Plaintiff sent an email (Doc. 68–41, Tab 13) to Smalls to complain about the proposed consolidation. In her initial email, Plaintiff stated that she was "very disappointed" that she and Katz were being asked to relocate. Doc. 68–41, Tab 13. She then made a case that the Gainesville West Office was more conveniently located to the courthouse and public transportation and asked why it was not chosen instead of the Gainesville Main Office. Smalls responded that she had already discussed her reasons in the meeting with Plaintiff and Katz. *Id.* In response, Plaintiff wrote,

> I would hope that this reassignment is done in good faith and not by personal relationship influencing the decision which takes away from the oath of office and fairness in all things done to an employee.
>
> Rumor is that I am being pushed and moved due to my previous involvement for testifying in a prior lawsuit against John Cynkar. Therefore, [Katz] must move as well to cover up the reassignment. If that is true, then you are putting me at risk again being under another supervisor which was named in another lawsuit which caused me to be in my current title and I am sorry that [Katz] has to suffer because of me.

*Id.*

The supervisor referenced in Plaintiff's email is Walkup. who was involved in Plaintiff's 2002 lawsuit against Defendant.

*See* Doc. 68–52 at ¶¶ 10–13 and 37. Walkup replaced Plaintiff as head of the Chiefland Office on November 30, 2001, after CA Thomas administratively reassigned Plaintiff from a CPS (supervisory) position to her current position as a CP Specialist. *See id.*; Doc. 68–46, Thomas Affidavit, at ¶ 34. Plaintiff suffered no cut in pay or benefits as a result of the reassignment, and the reassignment was not considered a demotion, but Thomas claims to have removed Plaintiff from her supervisory position because he concluded that she was "not well suited to be a supervisor." *Id.* Plaintiff's 2002 lawsuit, case number 1:02–cv–000090–MP, which alleged in part that the reassignment was unlawfully discriminatory, ended on November 20, 2003, when this Court granted summary judgment in favor of Defendant.

According to Smalls, Plaintiff was the only employee to complain about the proposed consolidation. Doc. 68–39 at ¶ 46. She states,

> Plaintiff's continued resistance to this reassignment after my decision had been communicated to her, as well as her thinly veiled accusation that I was somehow retaliating against her at [Katz's] expense, were very troubling. Her behavior in this regard exhibited poor judgment and an attitude of defiance toward my authority as a CA, and I considered her actions when 1 evaluated whether to promote her and/or reassign mer to a supervisory position a few months later.

*Id.* at ¶ 47.

Plaintiff asserts that her opposition to the proposed consolidation was based solely on her concern that she would be placed under Walkup. Doc. 71–43 at ¶ 8. However, Plaintiff has offered no evidence to support the reasonableness of her implied accusation that Smalls' selection of the Gainesville Main Office was motivated by a

desire to unlawfully retaliate against Plaintiff for her past protected activities. Indeed, the implied accusation appears to be entirely baseless. It was appropriate for Smalls to consider Plaintiff's propensity to lodge such accusations when deciding whether to place her in a supervisory position, and it is the kind of legitimate, non-retaliatory consideration that would motivate a reasonable employer to deny an employee's requested promotion and transfer to a supervisory position.

The same can be said of Smalls' consideration of Plaintiff's quarrels with her auditors in 2005. As discussed above, Plaintiff's 2005 complaints of unlawful discrimination by the auditors were not reasonable. However, because Defendant has offered other legitimate, nonretaliatory reasons for its actions, the Court need not consider whether those complaints, by themselves, constitute a legitimate, nonretaliatory reason for Defendant's actions.

It is also undisputed that Plaintiff complained on June 15, 2006, prior to the denial of her requested transfer but after the denial of her requested promotion, about being asked to help handle the cases of an officer named Lawanda Quinn, who was injured in a motorcycle accident and unable to work. *See* Doc. 68–39 at ¶ 57; Doc. 68–52 at ¶ 49; Doc. 68–18, Burgman Affidavit, Tab 1. Several officers were asked to assist with Quinn's cases, but Plaintiff was the only officer to complain. Doc. 67 at ¶ 62; Doc. 68–39 at ¶ 57. In her affidavit, Plaintiff characterizes her complaint as an expression of concern about not being able to do a good job on her existing cases if she were assigned additional cases. Doc. 71–43 at ¶ 12. However, Plaintiff's June 15, 2006, email to her supervisor, Gloria Burgman, complaining about the reassigned cases does not express any such concern. Doc. 68–18, Tab 1. Instead, Plaintiff simply lists the number of cases she and her co-workers are

currently handling and states that "it appears the work is not done equitable (sic) anymore when it comes down in assisting another county." *Id.*

Plaintiff has presented deposition testimony from two co-workers to rebut Defendant's contention that Plaintiff's unwillingness to help other employees motivated the denial of Plaintiff's requested transfer. *See* Doc. 72 at ¶ 44. However, the testimony cited does not rebut Defendant's contention that Plaintiff complained about having to handle Quinn's cases. Plaintiff also cites a performance evaluation awarding her a score of four ("exceeds expectations") in the category of her willingness to handle additional duties and special projects as needed. Doc. 72 at ¶ 14; Doc. 71–13, Plaintiff's Exhibit 17a. Defendant argues that this document is unauthenticated and should therefore not be considered. Even if the Court were to consider this document, it would not be sufficient evidence for a reasonable jury to conclude that Defendant's proffered reason is false. The evaluation in question is said to be for the period ending on February 28, 2006, which is several months before the incident cited by Smalls. In sum, it was appropriate for Smalls to consider Plaintiff's readiness to help cover an injured employee's caseload when deciding whether to transfer Plaintiff to a supervisory position, and it is the type of consideration that would motivate a reasonable employer to deny such a transfer.

The final legitimate, non-retaliatory reason Defendant cites for its actions is Plaintiff's "reckless and defiant behavior in directing polygraph examiners to stop sending her court-ordered polygraph examination reports on offenders she was monitoring." Doc. 66 at 37. Smalls states that this incident was "very fresh" in her mind during the application process for the promotion and transfer at issue and

that this incident, by itself, indicated to her that Plaintiff lacked the sound judgment needed to hold a supervisory position. Doc. 68–39 at ¶ 56. Smalls characterizes this event as "the most disturbing event evidencing Plaintiff's bad judgment," Doc. 68–39 at ¶ 48, while Walkup characterizes it as "perhaps the single most important event demonstrating Plaintiff's poor judgment." in Doc. 68–52 at ¶ 40.

As discussed above, Smalls issued Plaintiff a written reprimand on November 28, 2005, for failing to timely investigate a sex offender's admission that he violated the terms of his probation by having multiple contacts with his victim. Doc. 68–9, Exhibit 19. The sex offender made the admission during a polygraph examination. A report of the examination containing the admission was then faxed to Plaintiff, who was charged with handling the sex offender's case. It is undisputed that, prior to this incident, Plaintiff's practice was to place these reports in her offenders' case files. Doc. 67 at 60. Following this incident, however, it is undisputed that Plaintiff began directing polygraph examiners to not send her the polygraph reports but to instead simply send her confirmation that the examination had occurred. *Id.*; *see also* Doc. 68–39 at ¶ 50–53 and Tab 16; Doc. 68–52 at ¶ 42. There are two clear consequences to this direction: (I) Plaintiff would no longer receive reports like the one in which the sex offender admitted to violating his probation by having multiple contacts with his victim, eliminating any obligation on her part to investigate such admissions; and (2) because those reports would no longer be in Plaintiff's files, the auditors would no longer be able to catch any oversights in Plaintiff's monitoring of those reports, shielding Plaintiff from further reprimand at the expense of public safety.

In March of 2006, CSA Schenck discovered that Plaintiff was no longer keeping the polygraph reports in her offenders' files. *See* Doc. 68–39, Tab 16. On March 29, 2006, Plaintiff sent an email to Shenck reading:

Jack,

On 3/29/06, you reviewed my files and indicated that J need a copy of the polygraph examination in the file. I have verification by the provider that the polygraph was done in each of the required sex offender cases.

Please provide me a copy of the DC policy that requires a copy of the polygraph examination must be placed in the file. I read the policy and I can not find it.

Thanks.

*Id.* On that same day, Schenck forwarded Plaintiff's email to Marlene Jefferson, the Deputy Regional Director, who then forwarded the email to Smalls and requested that Smalls have Plaintiff's supervisor find out where she was putting the polygraph reports, since it appeared Plaintiff was not keeping them in the offenders' files. *Id.* On April 4, 2006, Smalls forwarded the email to Walkup, who replied on April 10, 2006, that Plaintiff "advises she is not receiving them from the examiner." *Id.*

Smalls states in her affidavit,

I was very disturbed by Plaintiff's statement. By telling the polygraph examiners not to send their examination reports to her. Plaintiff was consciously choosing to ignore important, available risk management information bearing directly on the sex offenders' compliance with the terms of their court-ordered supervision. This behavior was extremely reckless and unnecessarily placed the safety of the general public at risk. Plaintiff gave no explanation about why she suddenly began directing the polygraph examiners to cease sending her these reports. Accordingly, I can only conclude that she directed them

to stop ... in defiance of the written disciplinary action she received from me in the Bobby Jackson matter a few months earlier.

Doc. 68–39 at ¶ 54; *see also* Doc. 67 at ¶ 61; Doc. 68–52 at ¶ 46.

Both sides agree that there is no official rule requiring officers to keep polygraph examination reports in an offender's file. *See* Doc. 68–39 at ¶ 50; Doc. 68–52 at ¶ 41. Smalls states that, although she was frustrated with Plaintiff's actions, she did not discipline Plaintiff due to the fact that she was not in technical violation of any rule. Doc. 68–39 at ¶ 55. However, Smalls directed Walkup to instruct Plaintiff to begin receiving the reports again, which Smalls states Walkup did on April 11, 2006. *Id.*; *see also* Doc. 68–52 at ¶ 47; Doc. 68–55, Tab 13.

Although Plaintiff does not specifically dispute that these reports are valuable tools for monitoring a sex offenders' compliance with the terms of their probation, she asserts, "if it was true that I was consciously choosing to ignore important available risk information, then there would have been a rule that was enforced that required all of the CP [S]pecialists [to] keep the [polygraph reports] in the files." Doc. 71–43 at ¶ 2; *see also* Doc. 72 at ¶ 41. Plaintiff's assertion is illogical. Whether there was a rule requiring Plaintiff to keep the polygraph reports in sex offenders' case files is inconsequential. The fact remains that Plaintiff previously learned of a sex offender's multiple contacts with his victim, in violation of his probation, by virtue of having kept the sex offender's polygraph report in her case files. Had it not been for that practice, the auditor would not have discovered the violation of probation. Moreover, Plaintiff did more than fail to keep the reports in her files: she instructed the examiners to no longer send the reports at all, depriving herself of additional information about her

charges' compliance with the terms of their probation. It was reasonable for Smalls and Walkup to conclude that this action was taken in defiance of her previous reprimand for failing to investigate Mr. Jackson's admitted violation of probation, and it is the type of conclusion that, by itself, would motivate a reasonable employer to deny an employee's requested promotion and transfer to a supervisory position.

Plaintiff argues that this proffered reason is pretextual. In her response to Defendant's motion for summary judgment, Plaintiff asserts that she "was initially reprimanded in November 2005 ... for something that the state court found should not have been done in the first place. Moreover. DOC rules prohibited an arrest based on a polygraph examination alone." Doc. 73 at 18–19 (citing Doc. 72 at ¶ 6). In her statement of disputed material facts, Plaintiff also asserts that her "action in not initially arresting Jackson [was] legitimate as confirmed by the Order Dismissing Affidavit." Doc. 72 at ¶ 6 (citing Doc. 71–35, Plaintiff's Exhibit 42).

As has been established by uncontraverted evidence in the record, Plaintiff was issued a written reprimand in November 2005 for failing to timely investigate Mr. Jackson's admitted contact with his victim, not for failing to make an immediate warrantless arrest based solely on the polygraph examination report. The state court decision referenced by Plaintiff is the state court's ultimate decision, after Mr. Jackson's arrest, to not revoke Mr. Jackson's probation. *See* Doc. 71–35. The fact that the court did not revoke Mr. Jackson's probation is not relevant to whether Plaintiff erred by failing to investigate Mr. Jackson's admitted violation of probation. Therefore, Plaintiff's assertion that she was reprimanded "for something that the

state court found should not have been done in the first place" is false.

Moreover, Smalls and Walkup's primary objection to Plaintiff's behavior is her subsequent direction to the polygraph examiners to no longer send her the polygraph reports. Plaintiff offers no rebuttal to this objection, other than to note that she was not the only CP Specialist who was not filing the reports. As evidence of this fact, Plaintiff cites unauthenticated audits of her co-workers' case files indicating that the auditors had issued them exceptions for not having the most recent polygraph report in at least one of their offenders' files. There is no evidence, however, that any other employee ever directed polygraph examiners to stop sending them reports, and there is certainly no evidence that they did so in a manner that could reasonably be interpreted as an act of defiance for a previous written reprimand.

 Finally, Plaintiff cites as evidence of pretext other co-workers' favorable opinions of Plaintiff's job performance, as reported in their depositions and in a 2006 performance evaluation worksheet, and argues that she was far more qualified than Teel for the promotion to CPSS Position No. 07756. "[W]here an employee seeks to prove pretext through qualifications alone, the difference in qualifications must be so glaring that no reasonable impartial person could have chosen the candidate selected for the promotion in question over the plaintiff." *Vessels v. Atlanta Indep. Sch. Syst.*, 408 F.3d 763, 772 (11th Cir. 2005) (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1340 (11th Cir.2000)). "However, where the qualifications disparity is not the *sole* basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext." *Vessels*, 408 F.3d at 772 (citing *Bass v. Bd. of County Comm'rs.*, 256 F.3d 1095, 1107 (11th Cir.2001) ("Hiring a less qualified person can support an inference of discriminatory motivation.")).

As evidence of her superior qualifications, Plaintiff cites the fact that she received a promotional score of 82, while Teel received a score of 71. In addition, Plaintiff cites the deposition testimony of CPS Mark Alferi that he has a good working relationship with Plaintiff and that Plaintiff is helpful with sharing information about cases that are transferred between them. Doc. 71–53, Alferi Deposition, at 17–18. Plaintiff also cites the deposition testimony of Deborah Harden agreeing that Plaintiff "appeared to be diligent in the performance of her duties." Doc. 71–55, Harden Deposition, at 13–14.

Plaintiff buttresses this testimony with a performance evaluation where she received an overall grade of "exceeds expectations" for the time period of March 1, 2005, through February 28, 2006. In that evaluation, dated April 12, 2006, Plaintiff's supervisor stated:

Ms. Vinson ... has done a good job as a sex offender specialist. She does an outstanding job of holding her offenders accountable for their behavior by following up with instructions and advising the sentencing authority in a timely and efficient manner of willful violations. She also did a good job by working with some less experienced officers in the completion of investigations and other work related items, which helped 080 operations and provided on the job training for staff

Doc. 71–12, Plaintiff's Exhibit 17, at 7. The supervisor also graded Plaintiff as "exceeds expectations" for willingly handling additional duties and special projects as needed, *id.* at 6, and for "[f]airness, cooperation, respect, commitment, excellence, honesty and teamwork." *Id.* at 3. According to her supervisor's comments, both scores were based on Plaintiff's assistance

of other staff members and less-experienced officers. Plaintiff's current supervisor, Gloria Burgman, similarly states that "Plaintiff performs her duties as a CP Specialist well...." Doc. 68–18 at ¶ 8. However, Burgman states that Plaintiff "has an aggressive personality" that "can be very difficult to manage." *Id.* Burgman also cites Plaintiff's June 15, 2006, complaint about being assigned Quinn's cases as evidence that, "[a]lthough Plaintiff ultimately does what she is asked to do, she complains and questions the reasons for doing so." *Id.* at 8–9.

Plaintiff has provided a performance evaluation of Teel for the time period of March 1, 2005, through February 28, 2006. Doc. 71–17. Defendant argues that the evaluation is unauthenticated and should not be considered. Even if the Court were to consider the evaluation, it would not help Plaintiff's case, since Teel also received an "exceeds expectation" in the above-cited areas. Teel also received an "outstanding" in the area of "supervisory skills." *Id.* at 3–4. The position to which Smalls promoted Teel over Plaintiff is a supervisory one.

Plaintiff also notes that Teel was issued two counseling memoranda for policy violations, once by Smalls in 2004 for failing to note during a 60–day review that an officer under her supervision had failed to follow up on a probationer's admission that he traveled to another citing in violation of his probation, and once by Bissett–Dotson in January 2006 when one of the officers under her supervision failed to conduct an arrest of a probationer after his victim reported that he contacted her. *See* Doc. 72 at ¶¶ 9–10; Doc. 71–5, Plaintiff's Exhibit 3; Doc. 71–6, Plaintiff's Exhibit 3a; Doc. 71–7, Plaintiff's Exhibit 3b. Smalls issued the predetermination letter to Teel for latter policy violation in November 2005. Doc. 71–5. Smalls described the latter policy violation as "serious" but distinguished it from Plaintiff's November 2005

policy violation by noting that: (1) Plaintiff was the direct officer in charge of handling Mr. Jackson's case, while Teel was the supervisor of the direct officer in charge of handling the probationer's case; and (2) the probationer who contacted his victim in Teel's case was not a sex offender. Doc. 71–45 at 92–94. Teel received only a non-disciplinary counseling memorandum for the incident, while Plaintiff received a written reprimand for the Jackson incident. The record is void of any evidence regarding disciplinary action received by Teel's subordinate, who was directly responsible for the violation, but Smalls believes he was disciplined. *Id.*

Considered together, the evidence presented by Plaintiff would not lead a reasonable finder of fact to question the truthfulness of Defendant's proffered legitimate, non-retaliatory reasons for denying Plaintiff's requested promotion and transfer. Plaintiff has therefore failed to present sufficient evidence of pretext to survive summary judgment.

## IV. CONCLUSION

Plaintiff cannot establish a prima facie case of retaliation. The 2005 complaints of discrimination for which Plaintiff alleges retaliation are not statutorily protected activities under Title VII, because it was not reasonable for Plaintiff to believe that the employment actions complained of were unlawful. Similarly, the challenged placement of Plaintiff on a GPS on-call monitoring schedule is not an adverse employment action under Title VII. As for the remaining protected activities and adverse employment actions at issue, Plaintiff has failed to present sufficient evidence to establish a causal connection between them. Even if Plaintiff's 2005 complaints of discrimination constitute protected activities, and even if Plaintiff can establish a prima facie case, Plaintiff has failed to present

sufficient evidence to rebut Defendant's legitimate, non-retaliatory reasons for denying Plaintiff's requested promotion and transfer. Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

Defendant's Motion for Summary Judgment (Doc. 65) is GRANTED.